CLARENCE LEE ADKINS

*v.*

ST. FRANCIS HOSPITAL OF CHARLESTON,
WEST VIRGINIA, A CORPORATION

(No. 12413)

Submitted May 4, 1965.          Decided July 13, 1965.

*Herman D. Rollins,* for appellant.

*Jackson, Kelly, Holt & O'Farrell, William T. O'Farrell, A. Keith McClung, Jr.,* for appellee.

CAPLAN, JUDGE:

In this civil action, instituted in the Court of Common Pleas of Kanawha County, the Plaintiff, Clarence Lee Adkins, seeks to recover from the defendant, St. Francis Hospital of Charleston, West Virginia, damages for personal injuries caused by the alleged negligence of an employee of the defendant hospital.

The plaintiff, in March, 1962, was stricken with an illness which resulted in partial paralysis, temporarily destroying his eyesight and impairing the use of his left arm and left leg. He was thereupon admitted to the defendant hospital for care and treatment and was placed in a ward. Within a few hours after his admission the plaintiff's physician directed that he be given a tub bath. Pursuant to this direction an orderly, James Scott, was instructed to perform that duty. Scott placed the plaintiff in a wheelchair and wheeled him into the bathroom. While preparing the plaintiff for his bath, the orderly permitted him to fall against a steam radiator which was exposed and which was extremely hot.

According to the allegations in the plaintiff's affidavit, made a part of the record of this proceeding, Scott did not attempt to remove the plaintiff from the radiator but instead went for assistance. Due to his inability to move, the plaintiff was forced to remain on this hot radiator for a period of several minutes, thereby sustaining third degree burns to his left arm, left shoulder and body.

In his amended complaint the plaintiff charges that the defendant was guilty of negligence in that "it did not have the said radiator covered as common care and prudence would suggest and require." He further charges that the defendant was negligent in employing and retaining in its service the orderly, James Scott, "who was incompetent for said work and who had been released from the penitentiary of West Virginia only a few weeks prior thereto where

he had served a sentence of several years on conviction of a felony."

The defendant filed an answer to the complaint, wherein it specifically denied that it or any of its agents or employees were guilty of negligence incident to the fall of the plaintiff and averred that it used reasonable care in the selection and retention of its agents and employees. Answering further, the defendant averred that it is a nonstock, nonprofit corporation engaged in operating a charitable hopsital; that by reason thereof it is operating at a loss; and that while not admitting any negligence, it has no funds out of which to pay any judgment except those funds which are obtained by it as a charitable institution.

A motion to dismiss was then filed by the defendant on the grounds that it is a nonstock, nonprofit corporation operating a charitable hospital and is therefore not liable for the injuries complained of and for the additional reason that it used reasonable care in the selection and retention of its agents and employees. Specifically, the defendant averred that it was not negligent in employing James Scott, who had formerly served a sentence of several years in the penitentiary on a felony conviction.

Prior to the taking of any action upon the motion to dismiss, this action, upon the motion of the parties, was transferred to the Circuit Court of Kanawha County. Thereafter, the defendant filed a motion for a summary judgment, submitting therewith certain affidavits in support of its position. In these affidavits the defendant sought to establish that it is a nonstock, nonprofit corporation, maintaining a hospital which is operated without profit; that its charter, which was included as an exhibit, is probative thereof; that its employee, Scott, is experienced in and competent to perform the work for which he was employed; and that it was not negligent in the hiring and retention of such employee. The defendant avers that pleadings and affidavits show that it is entitled to a judgment as a matter of law.

The plaintiff countered with his affidavit and with the affidavits of his wife and H. D. Rollins, his counsel. In his

affidavit the plaintiff related the manner in which his injuries were received, alleging therein that such injuries were caused by the negligent acts of Scott. Attached to his affidavit as an exhibit was a certified copy of the order of sentence imposed upon Scott by the Intermediate Court of Kanawha County. Also set out in the affidavit was the plaintiff's statement that he was admitted to the defendant hospital as a paying patient, that this was understood by said hospital and that it had been paid in full for all services rendered.

In her affidavit the plaintiff's wife, Ruth Pauline Adkins, said that the defendant hospital refused to admit her husband as a patient without assurance that all bills incured in his behalf would be paid; that only after such assurance was given by Doctor Richard Lewis was the plaintiff admitted; and that all bills incurred in his behalf have been paid.

H. D. Rollins said, by affidavit, that he was employed to represent the plaintiff; that after he had contacted the defendant, an insurance adjuster approached him and advised him that said defendant hospital carried liability insurance; that said adjuster requested the deponent to withhold instituting an action on this claim so that they could discuss settlement; and that the adjuster, instead of discussing a settlement, turned the matter over to attorneys who now represent the defendant. In a further affidavit Mr. Rollins stated that all hospitals, except two, in the vicinity of Charleston are nonstock, nonprofit hospitals and that he is advised that all such hospitals carry public liability insurance which would cover an injury such as suffered by the plaintiff.

The circuit court, upon the pleadings, affidavits and exhibits referred to above, and upon arguments of counsel, sustained the motion and entered summary judgment for the defendant. It is clear from the court's Memorandum Opinion, made a part of this record, that its ruling was based upon prior decisions of this Court wherein it was held that a charitable hospital is not liable to a patient for the negligent acts of its servants, agents and employees in the absence

of negligence in the selection and retention of such servants, agents and employees. These decisions form a proper basis for the trial court's ruling that the defendant was entitled to a summary judgment as a matter of law. This appeal was granted, however, for the specific purpose of re-examining and reconsidering the principles expressed in those decisions and to decide whether such principles should be adhered to or rejected. The basic question to be decided here, therefore, is whether a nonstock, nonprofit hospital should be liable for the torts of its servants, agents and employees, or is such an entity immune from such liability? In other words, should we abide by the rule or doctrine of charitable immunity as applied by this Court or should such rule be abrogated?

The doctrine of charitable immunity was originally formulated in England in 1846, in the case of *The Feoffees of Heriot's Hospital* v. *Ross*, 12 Clark & Fin. 507, 8 Eng. Rep. 1508. Therein Lord Cottenham, holding that a charitable hospital could not be liable in tort, said: "To give damages out of a trust fund would not be to apply it to those objects whom the author of the fund had in view, but would be to divert it to a completely different purpose." It can thus be seen that the doctrine in its original form established an immunity from liability which was total and complete. In 1866 and 1871 this case was overruled and the rule that charitable corporations were immune from tort liability was abrogated. *Mersey Docks Trustees* v. *'Gibbs*, L.R. 1 H.L. 93; *Foreman* v. *Mayor of Canterbury*, L.R. 6 Q.B. 214.

Notwithstanding the fact that the English Courts had changed their course and no longer abided by the rule in *Heriot's* case, Massachusetts, in 1876, in *McDonald* v. *Massachusetts General Hospital*, 120 Mass. 432, 21 Am. Rep. 529, adopted this repudiated rule. Likewise, in 1885, Maryland followed *Heriot's* case in *Perry* v. *House of Refuge*, 63 Md. 20, 52 Am. Rep. 495. Rhode Island, in 1879, repudiated the immunity rule. *Glavin* v. *Rhode Island Hospital*, 12 R.I. 411, 34 Am. Rep. 675. It was in this confused state of decisions that the doctrine of charitable immunity found its way into the law of this country.

This Court never has embraced fully the doctrine of charitable immunity. In *Roberts* v. *Ohio Valley General Hospital,* 98 W. Va. 476, 127 S. E. 318, 42 A.L.R. 968, the first case in which this Court considered this question, it was held that a charitable hospital should not be held liable for the negligence of its employees. However, the opinion did not stop there, but went on to say that it is incumbent upon such hospital to use reasonable care in the selection and retention of its employees and for failure to do so it is liable for injuries received by its patients due to their incompetency. Thus, a qualified version of the charitable immunity doctrine was adopted by our Court in its first encounter with such doctrine.

This question was again considered in *Fisher* v. *Ohio Valley General Hospital Association,* 137 W. Va. 723, 73 S. E. 2d 667. In that opinion the Court recognized the growing conflict among authorities and pointed out various arguments forwarded therein in relation to the question of tort liability of charitable hospitals. It is noted therein, however, that the *Roberts* case had been the law of this jurisdiction for twenty five years and, believing that it represented the weight of authority, the Court decided to follow that case.

In *Koehler* v. *Ohio Valley General Hospital Association,* 137 W. Va. 764, 73 S. E. 2d 673, the rule adopted in the *Roberts* case was reiterated and followed. However, the Court placed a further qualification on the immunity rule, saying: "Though committed to the doctrine of the *Roberts* case, * * *, this Court is unwilling to extend immunity to a charitable institution against the claim of a stranger who sustains injury caused by the negligence of its servants and employees even though it exercises due care in their selection and retention." Thus, it was held that a stranger to or an invitee of a charitable hospital may maintain an action against such hospital if he is injured by the negligence of its servants, agents or employees. In still another case, *Meade* v. *St. Francis Hospital of Charleston, West Virginia,* 137 W. Va. 834, 74 S. E. 2d 405, this Court adhered to and followed the decisions of the *Roberts* and *Fisher* cases.

In the state of the present decisions of our Court a patient who is injured by the negligence of an employee of a charitable hospital may recover damages against that hospital if, and only if, it is proved by a preponderance of the evidence that it was negligent in the selection and retention of such employee; a stranger or invitee may collect damages from such hospital if he is injured by the negligence of its agent or employee, whether or not the hospital was negligent in the selection and retention of such employee or agent. Only the patient is now deprived of his right to require restitution for a wrong inflicted upon him by the negligence of an agent or employee of a charitable hospital. It is indeed difficult to understand why the immunity rule should be abrogated in the two foregoing instances and applied so steadfastly in the case of a negligently injured patient. This presents an inconsistency which must be eliminated from our law.

What is the nature of the defendant hospital in the instant case? As heretofore noted, it has been incorporated as a nonstock, nonprofit hospital. It has been referred to herein and by the parties as a charitable hospital. But is "charitable" a properly descriptive word in designating its character in the consideration of the question presented here? We think not. Doubtless some of its operating funds are derived from public spirited citizens, liberal in purse and generous in soul. However, considering the difficulty experienced by the plaintiff in gaining admission to this hospital as a patient by reason of his lack of funds, it appears clear that the major portion of its operating funds is raised by charges made for the care and treatment of paying patients.

The defendant renders a valuable service and it expects to be paid for such service. This is as it should be. The defendant makes a worthy contribution toward the alleviation and cure of the ills of mankind but, while in no way detracting from the estimable value of such contribution, it functions as a business and as such it must bear all the responsibilities of a business. It is entitled to be paid for services rendered, but it must also be prepared to meet all obligations incurred in the operation of its business.

In the early days of our society hospitals bore the true character of charitable institutions. They were a haven for the indigent ill, lame and disabled. The expense of their operation and maintenance was, for the most part, borne by contributions from charitably inclined citizens. The indigent rarely paid for services rendered to him. Charity in its true sense prevailed.

Today the concept of the hospital has changed materially. The worn, run-down accommodations have been replaced by modern buildings of brick, glass and steel. No longer are they reserved for the indigent ill, but are available to and are commonly used by people of all economic levels. They are staffed by trained physicians, surgeons, nurses and other employees. Available therein is the finest equipment devised by medical science. All of this is for the benefit of the patient. However, as heretofore noted, the modern hospital operates on a businesslike basis and, in that stature, must be responsible for all of its obligations.

In these circumstances, is it not a contradiction to say that such a hospital is a charitable institution? Certainly that nomenclature does not mirror the true meaning of the term. As the situation concerning hospitals has changed, so must we change our concepts of the law relative thereto. This was aptly expressed by the Michigan Court, in repudiating the immunity rule, in *Parker* v. *Port Huron Hospital*, 361 Mich. 1, 105 N. W. 2d 1, as follows: "The old rule of charitable immunity was justified in its time, on its own facts. Today we have a new set of facts. It is true that the new facts are still described by the same word in our English language—'charities'—but that is because our language has not changed as the facts of our life have changed. We have new facts described by old nomenclature. To say that the old rule of law still applies is to reach a result on the basis of nomenclature, not of facts; it is to apply a rule, proper in its time, to completely new facts, and to justify doing so by reference to language merely without regard to the facts."

In view of its actual character, what is the obligation of the defendant with regard to one who was negligently in-

jured while being treated and cared for as a patient in said hospital? The general rule is that liability results from the commission of a negligent act and any immunity from such liability is the exception. This principle was cogently stated by Associate Justice Rutledge, later an Associate Justice of the Supreme Court of the United States, in *President and Directors of Georgetown College* v. *Hughes,* 76 U. S. App. D. C. 123, 130 F. 2d 810. There Justice Rutledge said: "We start with general principles. For negligent or tortious conduct liability is the rule. Immunity is the exception. Human beings ordinarily are responsible for their own legally careless action. They respond also for negiligent harms inflicted by their agents and employees. So do business corporations. Likewise trustees and other fiduciaries generally are liable for their own negligence in administration and operation of the business or property committed to their control. Respondeat superior more and more has made them, as it has private corporations, responsible for wrongs done by their inferior functionaries.

"Generally also charity is no defense to tort. For wrong done, it is no answer ordinarily to say, 'He did not pay and was not bound to pay for the service. I gave it to him.' One who undertakes to aid another must do so with due care. Whether the Good Samaritan rides an ass, a Cadillac, or picks up hitchhikers in a Model T, he must ride with forethought and caution. He is not relieved because it is his driver rather than himself who lapses into carelessness. Nor does it matter that the doer of good is a corporation, if the act of gratuitous service is fairly incidental to the business. * * * Charity and gratuity generally go to motive, not to duty. * * * Charity suffereth long and is kind, but in the common law it cannot be careless. When it is, it ceases to be kindness and becomes actionable wrongdoing."

In support of the principle that immunity is an exception to the general rule of tort liability is the following statement in Restatement of the Law, Torts, Section 887: "No one, except the State, has complete immunity from liability in tort." And in subsection (2), Section 402 of Restatement

of the Law (2d), Trusts, the following is found: "A person against whom a tort is committed in the course of the administration of a charitable trust can reach trust property and apply it to the satisfaction of his claim." In the comment on said subsection (2) the author noted: "The trend of public opinion favors the denying of immunity, putting a charitable organization in the same position as that of non-charitable organizations, subjecting them to liability in tort not only for the negligence of the governing board but also for the negligence of employees, subjecting them to liability to recipients of benefits as well as to other persons."

In the instant case the basic argument of the defendant is that by reason of its nature as a charitable hospital it owes no duty of care to a patient so long as it exercises reasonable care in the selection and retention of its employees. While it relies on the immunity rule, it does not discuss any reason for the existence of such rule. We nonetheless believe that the underlying reasons sometimes forwarded in support of that rule should be considered here.

The doctrine of charitable immunity was based originally upon the trust fund theory. Great reliance is placed thereon by those supporting the immunity rule. This is the theory that the funds of a charity are held in trust, the diversion of which will not be permitted because it might result in destroying or seriously impairing the usefulness of charitable institutions; it would thwart he donor's intention; it would discourage donations to the fund; and it would require the use of funds for purposes other than those for which the trust was created, thereby depleting the fund.

We find this theory to be wholly without merit and reject it. It does not stand the test of today's society. As heretofore noted, charitable hospitals conduct their affairs as a business and as such are on the same footing as other corporations with regard to their obligations arising from the torts of their servants. There is no reason to believe that the donor of a charitable fund would object to the payment of damages therefrom for the wrongful injury of a beneficiary. Certainly, it does not appear that donors have been less generous in jurisdictions which have abolished the rule of

immunity. *President and Directors of Georgetown College v. Hughes,* 76 U. S. App. D. C. 123, 130 F. 2d 810; *Flagiello v. The Pennsylvania Hospital* (Pa.), 208 A. 2d 193.

The many qualifications of the immunity rule serve to emphasize the complete fallacy of the trust fund theory. If, thereunder, a charitable hospital is liable and must expend funds for the wrongful injury to a patient for the negligent employment and retention of employees; if, thereunder, such entity is liable for the negligent injury of a stranger or invitee; why, then, under that theory, should it not be liable to a patient who, through no fault of his own, was injured by the negligent conduct of an employee? If the fund is liable in the first two instances then certainly it should be in the last. Reason requires this result—justice demands it.

Another suggested basis for the immunity rule is that the doctrine of respondeat superior is not applicable to charitable hospitals. The general rule is that a principal is liable for the tortious acts of his agent which are done within the course and scope of the agent's employment. We again refer to the position of the so-called charitable hospital in the modern day business world. As Justice Rutledge said, in *President and Directors of Georgetown College v. Hughes,* 76 U. S. App. D. C. 123, 130 F. 2d 810, "Respondeat superior more and more has made them, [trusts] as it has private corporations, responsible for wrongs done by their inferior functionaries." In another learned opinion, wherein the immunity rule was abrogated, the following was stated: "Insistence upon respondeat superior and damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care." *Bing v. Thunig,* 2 N. Y. 2d 656, 163 N.Y.S. 2d 3, 143 N. E. 2d 3. We adhere to these expressions and hold that respondeat superior is applicable to charitable hospitals. See also *Flagiello v. The Pennsylvania Hospital,* 208 A. 2d 193, decided by the Pennsylvania Supreme Court on March 22, 1965.

A further suggested basis for the immunity rule is that of implied waiver. This is the theory that a person who re-

ceives the benefit of services of a charitable hospital impliedly agrees to waive the right to hold the hospital liable for any injuries he may receive. This theory is totally untenable. How could an infant in arms or one admitted while unconscious give such assent? The obviously necessary answer to this question alone reflects the utter fallacy of such theory.

Finally, it has been asserted that charitable hospitals should be immune from liability on the basis of public policy. This theory of defense of the immunity rule appears to convey the thought that it is more important to provide the public with the best medical care at the lowest possible cost than it is to provide idemnification to the individual who may have been tortiously injured. In other words, this presents a question of public rights against the rights of an individual. The rights of the public are nothing more than the collective rights of the individuals who constitute the public. If we deprive the individual of his right to restitution for an injury wrongfully inflicted upon him, and thereby favor the tortfeasor, then certainly we are going counter to the law which forbids such discriminatory practice. Neither this Court nor any other court has the authority to place anyone beyond the pale of the law applicable to everyone else. Public policy, rather than condoning immunity, demands that the individual members of the public be afforded the right to their day in court when they are injured by the negligent acts of another. Therefore, the generic defense of the immunity rule based upon public policy is not well taken.

The defendant takes the position that the great weight of authority in this country supports the charitable immunity doctrine. In the confused state of decisions now existing in the American Courts it would be most difficult, if not impossible, to list the jurisdictions which support and those which oppose this doctrine. The confusion is caused by the frequency and consistency with which the immunity rule has been qualified. As expressed by Justice Rutledge, "Judged by results, it has been devoured in 'exceptions'. Debate has gone on constantly, not so much as to whether, but concerning how far it should be 'modified', with ever widening modification."

Commenting further on the prevailing view as reflected by the decisions of the courts, Justice Rutledge said: "This much, however, is sure. The immunity, so far as it ever existed, has disappeared largely as to all persons and classes of claimants save one. This includes only so-called beneficiaries of the trust or charity. That class is now disintegrating, and the rights of the beneficiary, who needs the protection most, also are securing recognition. If we look at results, therefore, rather than words or forms of statement in opinions, for the test of what is 'the law' or 'prevailing rule', immunity is not 'the rule' and liability 'the exception'. The rule has become merely a relict in the multitude of departures."

It is significant, we believe, that our research has not disclosed, nor has there been cited any recent decision, wherein a court has gone from "non-immunity" to "immunity". On the other hand, many recent cases reflecting the converse are in evidence. *Flagiello* v. *The Pennsylvania Hospital,* Pa., 208 A. 2d 193; *Parker* v. *Port Huron Hospital,* Mich., 105 N. W. 2d 1; *Sheehan* v. *North Country Community Hospital,* 273 N.Y. 163, 7 N.E. 2d 28, 109 A.L.R. 1197; *Friend* v. *Cove Methodist Church,* Wash., 396 P. 2d 546; *Ray* v. *Tucson Medical Center,* 72 Ariz. 22, 230 P. 2d 220; *Haynes* v. *Presbyterian Hospital Association,* 241 Iowa 1269, 45 N. W. 2d 151. See also 15 Am. Jur. 2d, Charities, Section 153, and 25 A.L.R. 2d 40, Annotation, Section 3.

Our examination of the authorities reflects a clear trend in the recent decisions away from the immunity rule and toward the more realistic and tenable position of requiring a charitable corporation, as any other corporation must, to assume all of the obligations incurred in the operation of its business. One of these obligations is to make legally whole one who is injured by reason of the negligent act of its agents or employees. It makes no difference whether the injured party is a paying patient or one who is being served without charge. As heretofore noted, charity undertaken in a careless and wanton manner becomes actionable wrongdoing.

The doctrine of charitable immunity does not comport with elementary logic or fundamental justice. It violates a

basic principle of our law—for negligent or tortious conduct liability is the rule, immunity the exception. It fosters neglect while liability tends to induce care and caution. It has no proper place in today's social and economic structure. In view of all of the foregoing, we elect to adhere to what we consider the better reasoned decisions and abrogate completely the so-called immunity rule. We hold, in other words, that a nonstock, nonprofit hospital, though generally classified as a charitable institution, may be held liable to a patient for injuries negligently inflicted by its servants, agents and employees.

To the extent that *Roberts* v. *Ohio Valley General Hospital,* 98 W. Va. 476, 127 S. E. 318, 42 A.L.R. 968; *Fisher v. Ohio Valley General Hospital Association,* 137 W. Va. 723, 73 S. E. 2d 667; *Koehler* v. *Ohio Valley General Hospital Association,* 137 W. Va. 764, 73 S. E. 2d 673; and *Meade* v. *St. Francis Hospital of Charleston, West Virginia,* 137 W. Va. 834, 74 S. E. 2d 405, are inconsistent with the decision in this case, they are hereby overruled.

The defendant contends that since the doctrine of charitable immunities has been approved by this Court it should be affirmed in this case. Thus the matter of stare decisis is raised. Stare decisis is not a rule of law but is a matter of judicial policy. 20 Am. Jur., Courts, Section 184. It is a policy which promotes certainty, stability and uniformity in the law. It should be deviated from only when urgent reason requires deviation. However, stare decisis is not an inflexible policy. In the rare case when it clearly is apparent that an error has been made or that the application of an outmoded rule, due to changing conditions, results in injustice, deviation from that policy is warranted.

Much has been written and many cliches have been formulated to demonstrate why, in a certain case, stare decisis should not apply. We think that it is sufficient to say that a rule or principle of law should not be adhered to if the only reason therefor is that it has been sanctified by age. As expressed in *Lovings* v. *Norfolk & W. Ry. Co.,* 47 W. Va. 582, 35 S. E. 962, "It has been well said that 'it is better to be right than to be consistent with the errors of a hundred years'."

Another cogent observation relating to the force with which the policy of stare decisis should be applied is contained in the concurring opinion of Judge Brannon in *Town of Weston* v. *Ralston,* 48 W. Va. 170, 36 S. E. 446, as follows: "No legal principle is ever settled until it is settled right. The true rule is laid down in 23 Am. & Eng. Ency. L. 36: 'No prior decision is to be reversed without good and sufficient cause, yet the rule is not in any sense ironclad, and the future and permanent good to the public is to be considered rather than any particular case or interest. Even if the decision affects real estate interests and titles, there may be cases where it is plainly the duty of the court to interfere and overrule a bad decision. Precedent should not have an overwhelming or despotic influence in shaping legal decisions. No elementary or well-settled principle of law can be violated by any decision or any length of time. The benefit to the public in the future is of greater moment than any incorrect decision in the past. Where vital and important public and private rights are concerned, and the decisions regarding them are to have a direct and permanent influence in all future time, it becomes the duty as well as the right of the court to consider them carefully, and to allow no previous error to continue, if it can be corrected. The reason that the rule of *stare decisis* was promulgated was on the ground of public policy, and it would be an egregious mistake to allow more harm than good to accrue from it. Much not only of legislation, but of judicial decision is based upon the broad ground of public policy, and this latter must not be lost sight of."

We believe that the doctrine of charitable immunity, even in its modified form, is unsound and should no longer be followed. Consideration of the future and permanent good of the public, rather than that of a particular interest, requires a departure from the cases heretofore decided by this Court, wherein the doctrine of charitable immunity was embraced. We do not take this course lightly but do so only after solemn and thorough consideration.

The defendant asserts that the doctrine of charitable immunity, being part of the common law of this state, can be

abrogated only by an act of the Legislature. This assertion is based on an erroneous premise and is without merit. That doctrine never was a part of the common law adopted by our state. It was established in England in 1846 (*Heriot's* case, *supra*), and was overruled completely by 1871. Therefore such doctrine was not in force in 1872, when our present Constitution was adopted. Neither did the 1846 English decision ever find its way into the law of Virginia by virtue of the common law. The Commonwealth of Virginia adopted as its law the laws of England until its separation from the mother country and the adoption of its own Constitution. This separation took place long before 1846. Therefore, any decision by the English Courts subsequent thereto was nothing more than persuasive and had no binding effect.

Inasmuch as the immunity doctrine is not a part of the common law of this state, but rather is case law, this Court is without legal limitation to reconsider the principles adopted in its former decisions. This controverted doctrine was created, not by the Legislature, but by this Court. It is significant that the Court adopted a limited version of the immunity doctrine and found no difficulty in doing so without the aid of legislation. If the doctrine were a part of the common law it necessarily follows that to modify it would require legislative action. Clearly, this Court did not find such action necessary. In other words, if the immunity rule can be modified by the Court without the aid of legislation, then certainly the Court alone can abrogate the rule in its entirety. The judicial branch of the government need not call upon the legislative branch to rectify an error which the judicial branch itself created. This Court closed the door upon this right of action; if the door is to be opened, and we think it must, it is within the province of this Court to do so.

For the reasons stated, the judgment of the Circuit Court of Kanawha County is reversed and the case is remanded for a new trial.

*Reversed and remanded.*