No. 23-589, *Jacklin Romeo, Susan S. Rine, and Debra Snyder Miller v. Antero Resources Corporation*

**FILED**

**June 11, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Walker, Justice, dissenting:

This certified question proceeding presents a new wrinkle to a perennial problem: how to calculate the lessor's royalty payment under the terms of an oil and gas mineral lease. In the underlying case before the district court, the plaintiffs allege that Antero Resources Corporation breached their contracts by deducting post-production costs from their royalty payments; this is one of the most contentious legal issues in the oil and gas industry. "On one side of the spectrum is the established and majority 'at the well' approach, while on the other is the minority 'first marketable product' approach."[1] Today, the majority of this Court selects neither of those options and expands *Wellman*[2]/*Tawney's*[3] "point of sale" requirement to (1) oil and gas processed and shipped to downstream

---

[1] William T. Silvia, *Slouching Toward Babel: Oklahoma's First Marketable Product Problem*, 49 Tulsa L. Rev. 583 (Winter 2013).

[2] *See* Syl. Pt. 4, *Wellman v. Energy Res., Inc.*, 210 W. Va. 200, 557 S.E.2d 254 (2001) ("If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.").

[3] *See* Syl. Pt. 10, *Estate of Tawney v. Columbia Natural Res.*, 219 W. Va. 266, 633 S.E.2d 22 (2006) ("Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.").

1

locations as far away as the Gulf Coast of Louisiana, and (2) enhanced byproducts such as natural gas liquids. Because the majority's holding expands the breadth of an already unsound rule, I respectfully dissent. Oil and gas leases are contracts.[4] And under West Virginia law, contracts are to be interpreted to carry out the intent of the parties, as that intent is evidenced by the contract's language. I would have taken this opportunity to rewrite the certified questions and overrule our holdings in *Wellman/Tawney*.

*Tawney* was a mistaken decision, an outlier on the day it was decided and one that's become lonelier with time. Its predecessor *Wellman*, also wrongly decided, set the stage for what has become two decades of massive judicial revision of oil and gas leases across our State. In *Wellman*, this Court addressed an action brought by the lessors seeking damages for failure to pay proper royalties.[5] Similar to the leases at issue here, the leases in *Wellman* provided for natural gas royalties of "'one-eighth (1/8) of the market value of such gas at the mouth of the well[.]'"[6] When resolving the question of whether or what expenses were properly deductible, the Court acknowledged the split of authority regarding deduction of post-production costs and the rationale of those states holding that post-

---

[4] *Ascent Res. - Marcellus, LLC v. Huffman*, 244 W. Va. 119, 125, 851 S.E.2d 782, 788 (2020); *see also* Phillip T. Glyptis, *Viability of Arbitration Clauses in West Virginia Oil and Gas Leases: It Is All About the Lease!!!*, 115 W. Va. L. Rev. 1005, 1007 (2013) ("[A] lease is by definition a contract. All rights and protections are controlled by the principles of contract law and depend on the proper construction.").

[5] *Wellman*, 210 W. Va. at 204, 557 S.E.2d at 258.

[6] *Id.*

production costs are not properly deductible from the lessor's royalty.[7] The Court noted that under the implied covenant to market, the lessee embraces the responsibility to get the oil or gas in marketable condition *and* actually transport it to market.[8] Noting simply that like other marketable product rule states, "West Virginia holds that a lessee impliedly covenants that he will market oil or gas produced[,]" the Court concluded that "unless the lease provides otherwise, the lessee must bear all costs incurred in exploring or, producing, marketing, and transporting the product to the point of sale."[9]

As I explained in my dissent in *SWN Production Company, LLC v. Kellam*,[10] the weaknesses in *Wellman's* reasoning are well-known. Simply stated, *Wellman* based its interpretation of the implied covenant to market on a section from a 1951 treatise that says, "it has been the practice to compensate the landowner by selling the oil by running it to a common carrier and paying to [the landowner] one-eighth of the sale price received."[11]

---

[7] *Id*. at 210, 557 S.E.2d at 264.

[8] *Id*.

[9] *See* note 1.

[10] 247 W. Va. 78, 99, 875 S.E.2d 216, 237 (2022) (Walker, J., dissenting).

[11] *Wellman*, 209 W. Va. at 210, 544 S.E.2d at 263 (quoting Robert Donley, The Law of Coal, Oil and Gas in West Virginia and Virginia § 104 (1951)).

But *Wellman* omitted another section of the treatise that acknowledges that the implied covenant to market does *not* extend to minerals sold off-site.[12]

In *Tawney*, this Court compounded the faulty reasoning in *Wellman* and found the lease's "at the wellhead" language ambiguous because it was "imprecise" and did not "indicate *how* or *by what method* the royalty is to be calculated or the gas is to be valued."[13] Citing the "'general rule as to oil and gas leases . . . that such contracts will generally be liberally construed in favor of the lessor, and strictly as against the lessee,'" the Court then construed the lease against the lessee and held that the "at the wellhead" language was insufficient to allow deduction of post-production expenses.[14] *Tawney* held that a lease must provide a precise "method of calculating" post-production expenses if a lessee wishes to contract away *Wellman*'s expanded implied covenant to market.[15] But no court should require parties to contract away an implied covenant, much less impose a heightened burden for doing so. Rather, implied covenants are merely gap fillers courts can use to achieve the parties' intentions where not otherwise stated in the contract.

---

[12] *Kellam*, 247 W. Va. at 98, 875 S.E.2d at 236 (Walker, J., dissenting).

[13] *Tawney*, 219 W. Va. at 272, 633 S.E.2d at 28 (emphasis in original).

[14] *Id.* at 273, 633 S.E.2d at 29 (quoting Syl. Pt. 1, *Martin v. Consol. Coal & Oil Corp.,* 101 W.Va. 721, 133 S.E. 626 (1926)).

[15] *See* note 2.

All in all, *Wellman* and *Tawney* are problematic and academic commentators have been unsparing in their criticism.[16] For example, Byron C. Keeling has stated that "*Tawney* remains a glaring example of an opinion that misapplies the 'against the lessee' rule of lease construction[,]" by not recognizing that the "against the lessee" rule is a rule of last resort.[17] Instead of applying the rule properly, *Tawney*, uses it to rewrite a "lease to dictate a result that is contrary to its plain terms."[18] But it is not the province of this Court to rewrite an oil and gas lease to reflect the Court's view of a fair bargain. We certainly

---

[16] *See, e.g.*, John W. Broomes, *Waste Not, Want Not: The Marketable Product Rule Violates Public Policy Against Waste of Natural Gas Resources*, 63 U. Kan. L. Rev. 149, 173-74 (2014) ("In both *Wellman* and *Tawney*, we see West Virginia's unique approach to the deductibility of post-production costs. . . . The more intriguing aspect of the West Virginia rule is the manner in which it clings to pre-deregulation marketing practices. As Professor David Pierce notes in his article, *Royalty Jurisprudence: A Tale of Two States*, the treatise on which the West Virginia Supreme Court relied so heavily for its pronouncement that West Virginia lessors traditionally received a cost-free royalty out of the sale price was written in 1951 in the midst of the regulatory scheme imposed under the Natural Gas Act of 1938, in which almost all sales of natural gas occurred at the wellhead. Similarly, the *Tawney* court impugned the lessee, stating, 'although some of the leases below were executed several decades ago, apparently [the lessee] did not begin deducting post-production costs from the lessors' royalty payments until about 1993.' As Pierce observes, this change in the lessee's accounting practices corresponded with the end of the regulatory scheme in 1993. Accordingly, it seems that the West Virginia court failed to consider the effects of regulation and deregulation on the sales and marketing practices of lessees, assuming instead that historical practices from a bygone era of robust regulation represent industry norms even in an unregulated market.") (footnotes omitted).

[17] Byron C. Keeling, *Contra Proferentem in the Oilpatch? The "Against the Lessee" Rule of Lease Construction*, 9 LSU J. Energy L. & Res. 345, 372 (2021).

[18] *Id*. at 375.

would not go to such extreme measures to rewrite contracts in any other context.[19]  Rather, keeping with our commitment to freedom of contract, we do not add to or subtract from a contract's language or interpolate constraints.

As this Court stated in *Leggett v. EQT Production Company*,[20] commentators have noted that *Wellman* failed to recognize the variations in the first marketable product doctrine from state to state and adopted yet another, broader version—the "point of sale approach."[21]  This results in an even bigger windfall for lessors than the already less popular marketable product approach.[22]

So, the question is whether the principle of stare decisis limits our ability to correct what I believe are unsound precedents.  The majority sees no reason to "change decades of law upon which thousands of people have relied in ordering their economic

---

[19] When examining a contract in an employment dispute, this Court stated that: "Our task is not to rewrite the terms of contract between the parties; instead, we are to enforce it as written." *Fraternal Ord. of Police, Lodge No. 69 v. City of Fairmont*, 196 W. Va. 97, 101, 468 S.E.2d 712, 716 (1996).  In the same way, we have held parties to a contract dispute involving an insurance policy to the plain language in the policy and noted that: "'We will not rewrite the terms of the policy; instead, we enforce it as written.'" *Auto Club Prop. Cas. Ins. Co. v. Moser*, 246 W. Va. 493, 500, 874 S.E.2d 295, 302 (2022) (quoting *Payne v. Weston*, 195 W. Va. 502, 507, 466 S.E.2d 161, 166 (1995)).

[20] 239 W. Va. 264, 800 S.E.2d 850 (2017).

[21] *Id*. at 273 n.13, 800 S.E.2d at 859 n.13.

[22] *Id*. at 276, 800 S.E.2d at 862 (citing Byron C. Keeling & Karolyn King Gillespie, *The First Marketable Product Doctrine: Just What Is the "Product"?*, 37 St. Mary's L.J. 1, 77, 79 (2005)).

affairs." I recognize that "[c]onsiderations in favor of *stare decisis* are at their acme in cases involving property and contract rights[,]"[23] but it is our duty to examine and overrule prior decisions when they are legally unsound to avoid perpetuating the error. "The reason that the rule of stare decisis was promulgated was on the ground of public policy, and it would be an egregious mistake to allow more harm than good to accrue from it."[24] This Court has stated that, "[n]o prior decision is to be reversed without good and sufficient cause; yet the rule is not in any sense ironclad, and the future and permanent good to the public is to be considered, rather than any particular case or interest."[25]

Stare decisis does not compel unending adherence to *Wellman/Tawney's* abuse of judicial authority. The time has come for this Court to overrule those cases for the permanent good of the public. This Court never should have resorted to judicial revision of leases when, even from a basic viewpoint, their plain meaning indicated where royalty calculations should occur. An unfortunate consequence of *Wellman/Tawney's*

---

[23] *Payne v. Tennessee*, 501 U.S. 808, 828 (1991). Even so, the Supreme Court of the United States has recently overruled precedent where the Court's shift threatened vast regulatory and economic consequences. *See Janus* v. *Am. Fed'n State, Cnty. & Mun. Emps.*, 585 U.S. 878 (2018); *id.* at 952 (Kagan, J., dissenting) (noting that the Court's opinion called into question "thousands of . . . contracts covering millions of workers"); *South Dakota* v. *Wayfair, Inc.*, 585 U.S. 162, 186 (2018) (noting the "legitimate" burdens that the Court's overruling of precedent would place on vendors who had started businesses in reliance on a previous decision).

[24] *Adkins v. St. Francis Hosp.,* 149 W. Va. 705, 719, 143 S.E.2d 154, 163 (1965) (internal citation and quotation omitted).

[25] *Id.*

modification of the meaning of "at the well" lease clauses is that lessors receive benefits that they do not necessarily deserve under the terms of the contract, at the producers' expense. We cannot pretend to know how producers and royalty owners will respond if this Court overturns *Wellman/Tawney*, but this uncertainty cannot guide our approach: "And even if we could foresee what will happen, we would have no authority to let that knowledge influence our decision. We can only do our job, which is to interpret the law, apply longstanding principles of *stare decisis*, and decide this case accordingly."[26]

The majority goes on to defend *Wellman* and *Tawney* by noting that the only post-*Tawney* case in which this Court evidenced some support for the "industry's attacks" on them was *Leggett*—a case that dealt with West Virginia Code § 22-6-8 (a statute offering certain protections for royalty owners who hold flat-rate leases[27]), that was effectively overruled by the Legislature's amendments to the statute.[28] The majority attempts to debunk *Leggett's* criticism of *Wellman/Tawney* by devoting considerable

---

[26] *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022).

[27] Flat-rate leases require the producer to pay the royalty owner a set royalty per well, per year, whether that well produces oil and gas or not. In West Virginia Code § 22-6-8, the Legislature provided certain protections for royalty owners who hold flat-rate royalty leases, those "not inherently related to the volume of oil or gas produced or marketed[.]" *Id.* at § 22-6-8(b). But the Legislature did not extend these statutory protections to freely negotiated proceeds-based royalty leases.

[28] While the majority asserts that *Wellman's* holding was "reaffirmed" by the Legislature's post-*Leggett* amendments to West Virginia Code § 22-6-8, those amendments are irrelevant to the issue before us. The statute does not apply to freely negotiated proceeds-based royalty leases.

8

attention to *Kellam's* criticism of *Leggett*. This endeavor is both telling and troubling. If we look beyond the rhetoric of the majority's indignation toward those who recognize the weaknesses of *Wellman/Tawney*—two dissenting Justices in this case, a plurality of the Court in *Leggett*, the dissenting Justice in *Kellam*, and several academic commentators— we see that *Kellam* does nothing to advance the majority's position because it exposes the flaws of *Wellman/Tawney*.

In *Kellam*, the parties agreed that the lessee would pay the lessor royalties based on the sale price "*less any charges for transportation, dehydration, and compression paid by the [the lessee] to deliver the oil, gas, and/or coalbed methane gas for sale.*"[29] So, there should have been little room to dispute the unambiguous contract terms: the lessee pays the lessor royalties based on the proceeds minus the listed expenses. But considering *Leggett's* criticism of *Wellman/Tawney*, along with their difficult requirements, the parties disputed whether their contract terms cracked *Tawney*'s code to negate an implied covenant. In *Kellam*, the district court certified two questions, asking whether *Tawney* was still good law and whether the lease met its requirements. We answered the first question in the affirmative but declined to answer the second question, stating that it presented a

---

[29] *Kellam*, 247 W. Va. at 82, 875 S.E.2d at 220 (emphasis in original).

9

question of contract interpretation that could only be answered by examining the lease and applicable principles of contract law.[30]

*Kellam* exposed the Gordian knot this Court created in *Wellman/Tawney*: when those cases imposed unyielding discriminatory terms to "freely negotiated leases," traditional principles of contract interpretation were turned upside down, leaving practitioners and courts with no clear direction. It is hard to imagine a more unworkable rule. As I said in my dissent in *Kellam*, it's time we untangle this knot; this Court should "remove all confusion by wiping the slate clean of *Wellman* and *Tawney* and allow[] parties to govern their own affairs—as we do in other commercial relationships. We do not need to protect parties from their own contracts."[31]

The majority also denies that its holdings extend the *Wellman/Tawney* doctrine far beyond its original breadth, but they indisputably do. While the phrase "point of sale" is pulled from *Wellman/Tawney's* syllabus points, those syllabus points "must be read in light of the opinion as a whole."[32] *Wellman/Tawney* dealt with oil and gas produced and sold in a local basin, a vastly different fact pattern than the issue presented here. Antero is processing the oil and gas and shipping it to downstream locations as far away as the

---

[30] *Id*. at 90, 875 S.E.2d at 228.

[31] *Id*. at 99, 875 S.E.2d at 237 (Walker, J., dissenting).

[32] *State v. McKinley*, 234 W. Va. 143, 149, 764 S.E.2d 303, 309 (2014).

Gulf Coast of Louisiana, as well as enhancing it into byproducts such as natural gas liquids. Antero's costs of compression, dehydration, treating, gathering, processing, fractionation, and transportation to move the raw oil and gas from the wellhead to downstream resale locations are considerable post-production costs not contemplated in *Wellman/Tawney*.

West Virginia is the *only* jurisdiction in the country to adopt this "point of sale" approach. When a three-member majority throws off restraints and sets the law on a drastic new course, it is prudent for us to question whether that power has been exercised judiciously or whether it is instead another exercise in judicial activism. Unfortunately, the majority has taken the latter approach in this decision which is the latest in a series of patently wrong rulings in our oil and gas law. For this reason, I dissent.