Kostas **JIVELEKAS** and Helen Jivelekas, Appellants (Plaintiffs below),

v.

**CITY OF WORLAND, Wyoming, a Municipal Corporation, Appellee (Defendant below).**

No. 4499.

Supreme Court of Wyoming.

Feb. 2, 1976.

John W. Davis, Worland, for appellants.

Elmer J. Scott, of Scott & Jones, Worland, for appellee.

Before GUTHRIE, C. J., and RAPER and ROSE, JJ.

ROSE, Justice.

## CONTENTION OF THE PARTIES

The plaintiffs charge that damage to their home was caused from a sewer backup which occurred as a result of the defendant-city's negligent planning, construction and maintenance of its sewer line. Plaintiffs ask money damages and injunctive relief to compel the city "to take necessary steps to replace the sewer line." Additionally, the plaintiffs-appellants rely upon the doctrine of res ipsa loquitur to supply evidence of defendant's failure to exercise due care.[1]

In response, the defendant-appellee-City of Worland contends that it was not negligent in the construction—design—operation or maintenance of the sewer line, nor was its alleged negligence a proximate cause of the purported damage. The city also asserts the doctrine of res ipsa loquitur is not available under the applicable law and the facts of this case. Moreover, the city says that the plaintiffs cannot rely upon negligent construction and design of the sewer nor the doctrine of res ipsa loquitur because construction and design of a sewer is a governmental function for which, contends Worland, the city enjoys governmental immunity.[2]

## ISSUES FOR DECISION

With the legal position of the parties thus defined, we address ourselves to these issues:

A. Was the city's alleged negligence in the planning, construction and maintenance of the sewer line a proximate cause of the plaintiffs' damages?

B. Is the doctrine of res ipsa loquitur available to the plaintiffs, absent immunity?

C. Does the doctrine of sovereign immunity apply in Wyoming in a way such as to make the concepts of negligence in design and construc-

---

1. In *Stanolind Oil & Gas Co. v. Bunce*, 51 Wyo. 1, 62 P.2d 1297, 1301–1302, we adopted as elements of the doctrine of res ipsa loquitur the following when we said:

 "Of similar import are the essentials of the doctrine as well phrased by Dean Wigmore, 5 Wigmore on Evidence (2d Ed.), 498, § 2509, thus:

 "'(1) The apparatus must be such that in the ordinary instance no injurious operation is to be expected unless from a careless construction, inspection, or user; (2) Both inspection and user must have been at the time of the injury in the control of the party charged; (3) The injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured.'"

2. The terms governmental immunity and sovereign immunity are, generally speaking, used interchangeably throughout this opinion.

tion and res ipsa loquitur moot in this case?

D. Is the doctrine of sovereign immunity any longer applicable in Wyoming?

## FACTS

An expert testified the sewer line in question was a six-inch line which emptied into an eight-inch line—that the line would probably be an eight-inch line if it were built today—he judged that it had not been anticipated that the line would be extended at the time it was built and said that at one time he had suggested it be replaced. He agreed that the grade could have some effect on the plugging propensities of a sewer line and he noted the grade for this line was not constructed as originally planned. The witness prepared a study of the line which shows that it is adequate to serve the 287 people now served by it. There was testimony to the effect that the way the line was designed and built was not the way it should be designed and built and that the city should have gone to an eight-inch line. A witness said it was bad practice to have a minimum flow of less than two feet per second and the minimum flow of this line was less than that in its west segment. It was the expert's observation that in designing, all possibility of plugging cannot be eliminated, but:

" . . . [Y]ou try and design as best you can to eliminate as many problems as possible . . . "

There was testimony to the effect that there was no way to prevent a sewer from becoming plugged with foreign objects. Officials of the city testified that this was the first plugging in this line in this area since its construction in 1950.

The plaintiffs-householders testified about the water in the basement and in the manhole behind their house and further said that the city crew, once it located the plug, had no trouble in unplugging the line.

Except for damages, this was the essence of the proof as shown by the record and as summarized by the appellants' brief.

Appellants contend that they have made a prima facie showing of the appellee's negligence and have adequately proven such negligence to be a proximate cause of the damage complained of.

## PROXIMATE CAUSE

At the end of the plaintiffs' case, the appellee-city made a motion to dismiss which was granted. A judgment was entered, the court stating:

" . . . [T]he Plaintiffs have failed to prove by a preponderance of the evidence that any negligence on the part of the City was the proximate cause of Plaintiffs' damage; . . . "

We agree with the holding of the trial court, except that we would have omitted the words "a preponderance of the evidence" so that the sense of the pronouncement would read that the plaintiffs had failed to prove proximate cause with *any* evidence. There is no causal relationship shown by this record connecting any alleged negligence of the defendant with damage claimed by the plaintiffs.

■ Plaintiffs have to show in the trial of their cases that the negligence caused the injury and damage unless some other acceptable proof theory comes to their rescue. Furthermore, negligence cannot be presumed from the mere happening of the accident. *Elite Cleaners and Tailors, Inc. v. Gentry*, Wyo., 510 P.2d 784, 788.

■ We do not pass upon the question of whether or not the plaintiffs made a prima facie showing of negligence in the area of construction, design or maintenance, but we do affirm the trial court and hold that there was no proof that any such purported negligence was the proximate cause of plaintiffs' claimed property damage.

In *Savage v. Town of Lander, 77* Wyo. 157, 175, 309 P.2d 152, 158, where a verdict was directed against the plaintiff who charged negligent maintenance of a gutter, we held that, although there was some proof of negligence, there was no proof of proximate cause and said:

"To justify a recovery the wrongful act charged must be the proximate or legal cause of the injury complained of. See *Lemos v. Madden,* 28 Wyo. 1, 200 P. 791; 15 Am.Jur., Damages, § 65; 38 Am.Jur., Negligence, § 51; 52 Am.Jur., Torts, § 30; 65 C.J.S. Negligence, §§ 104, 106."

That rule is applicable here.

Where is the evidence of negligent planning, construction or maintenance from which the trial court or this court could find the damages to have flowed?

The engineering experts were never asked whether or not, in their opinion, the alleged faulty design, construction and/or maintenance was or could have been a contributing cause of the clogged sewer line under the proven facts of this case. Furthermore, they did not testify that, in their opinion, such was the case.

To satisfy the plaintiffs' proof requirements in a way which would have withstood the onslaught of a motion to dismiss (unless res ipsa supplies the evidentiary deficiency) it was necessary either to have testimony as to the cause of the plugging or an opinion of an expert based upon evidence from which he could draw an acceptable conclusion. There was no proof that the defendant's purported negligence was the proximate cause of the plaintiffs' damage.

We do not pass upon whether there was sufficient evidence in the record to furnish the foundation for a hypothetical question from which an opinion could be elicited. We do hold, however, that without properly-founded expert opinion and absent hard evidence connecting the plugging with the alleged negligent construction, design and/or maintenance, the causation requirements were not fulfilled.

### RES IPSA LOQUITUR

The appellants-plaintiffs further assign error charging that the doctrine of res ipsa loquitur applies and, because of it, the court should have ruled the plaintiffs to have been rescued from the severe result which comes with the sustaining of the defendant's motion to dismiss.

The defendant-appellee contends that res ipsa is not applicable for the reason that the consulting engineer, Robert L. Champlin, in his testimony, stated that there was no way to prevent a sewer from becoming obstructed by foreign objects. Defendant therefore reasons that appellants are precluded by *Stanolind Oil & Gas Co. v. Bunce,* 51 Wyo. 1, 62 P.2d 1297, 1301–1302, where we held that the doctrine does not apply unless the "apparatus" (sewer line) is such

"that in the ordinary instance no injurious operation is to be expected unless from a careless construction, inspection, or user; . . ."

It is true that the essence of Dr. Champlin's testimony is as contended by appellee. The witness testified:

"Q. What has your experience or familiarity shown you?

"A. All sorts of things are found in sewer lines. The Denver system has their main sewer plant is downstream from several meat packing areas and have had cows [sic] heads, steers [sic] heads, coming down the sewer lines, tremendous limbs. How they get in the sewer line I have no idea. All sorts of materials show up in sewer lines, yes, sir.

"Q. If the experience in Worland have been they have long pieces of two by four, large boulders and foreign objects like that, could you accept that as being true?

"A. Yes, sir, I would.

"Q. And there isn't any way that the City by design or maintenance can prevent clogging from those causes, is there?

"A. From my experience every city seems to have some of this happening at certain periods, yes, sir."

At page 66, line 12, these questions were asked:

"Q. *You do know that sewers generally plug every place, don't they?*

"A. *Occasionally.*

"Q. It isn't only in the four or six inch but in the eight and ten inch too, isn't it?

"A. That is a possibility . . .

"Q *There isn't any way for the—for a municipality to anticipate where and when a sewer is going to be plugged, is there?*

"A. *No, sir.* Cities do have certain areas of towns certain areas of the town or city that they have problems with. This is a normal thing. A certain section might have more problems than other sections. Again, it has to do with the velocities and the use of the sewers themselves and so forth. *You cannot predict that, no, sir.*" [Italics supplied]

There is no evidence elicited to refute the witness' position that all sewers occasionally become plugged and that this condition occurs even though due care is exercised in the design, construction and maintenance of a sewer line.

The doctrine of res ipsa loquitur cannot substitute the missing causal evidence here in face of the rule announced first by us in *Stanolind,* supra, and later in *Rafferty v. Northern Utilities Company,* 73 Wyo. 287, 278 P.2d 605, and thereafter followed in *Hall v. Cody Gas Company,* Wyo., 477 P. 2d 585; *Sayre v. Allemand,* Wyo., 418 P. 2d 1006; *North Central Gas Company v. Bloem,* Wyo., 376 P.2d 382; and *Langdon v. Baldwin-Lima-Hamilton Corporation,* Wyo., 494 P.2d 537, which is:

" . . . '[W]hen a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, *and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care,* it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care.'" [Italics supplied] (From *Stanolind Oil & Gas Co. v. Bunce,* supra, wherein we adopted the definition of the doctrine of res ipsa loquitur from *San Juan Light & T. Co. v. Requena,* 224 U.S. 89, 32 S.Ct. 399, 401, 56 L.Ed. 680.)

■ We must therefore conclude, based upon the uncontradicted testimony of competent witnesses in this case, that sewer lines *in the ordinary course of things do* cause damage by reason of plugging *even though due care is exercised* in construction, design and maintenance and thus the doctrine of res ipsa loquitur is not applicable.

In reaching this conclusion, we do so based upon the evidence in *this* record and we do not hold that, in the proper case, the doctrine of res ipsa loquitur can never come to the aid of a plaintiff who has suffered injury or damage from a municipally-constructed, designed, owned and operated sewer line. See *Cummins v. City of West Linn,* Or.App., 536 P.2d 455 (1975).

INJUNCTIVE RELIEF

■ Since there is no liability, there can, of course, be no injunctive relief. Before injunctive relief will be granted the thing complained of must have caused actual injury and the cause must be proven and identified. It is said in 42 AmJur2d, Injunctions, § 30, p. 766:

" . . . It must be a material and actual injury, existing or presently threatened, and not one that is fanciful, theoretical, or merely possible, or that is doubtful, eventual, or contingent."

GOVERNMENTAL IMMUNITY[3]

*Introduction*

Notwithstanding our holding on the issues of proximate cause and res ipsa loquitur, I would hold that the question of gov-

---

3. In view of the dissents of Chief Justice Guthrie and Justice Raper to the immunity section of the opinion, the following expressions are mine alone and not those of the court.

ernmental immunity is squarely before us because the appellee, City of Worland, urges that even if it were shown to be negligent in the construction and design of the sewer system and its negligence proven to be the proximate cause of the damage— nonetheless, it is not liable because the construction and design of sewers are governmental functions and in these pursuits the city is immune from tort claims.[4] The cases cited in support of this proposition are: *Quest v. Town of Upton*, 36 Wyo. 1, 252 P.2d 506; *Wilson v. City of Laramie*, 65 Wyo. 234, 199 P.2d 119; *Savage v. Town of Lander*, 77 Wyo. 157, 309 P.2d 152; *Maffei v. Incorporated Town of Kemmerer*, 80 Wyo. 33, 338 P.2d 808; *Lore v. Town of Douglas*, Wyo., 355 P.2d 367; *Chavez v. City of Laramie*, Wyo., 389 P.2d 23; *Town of Douglas v. York*, Wyo., 445 P.2d 760; and *McCormick v. Town of Thermopolis*, Wyo., 478 P.2d 67.

If Worland enjoys governmental immunity, it would not matter whether it was negligent in the design or construction of its line or whether its negligence was a proximate cause of the alleged damage to the plaintiffs, or whether, if the negligence and proximate cause could not be proven, the doctrine of res ipsa loquitur would come to the aid of the complainants in an evidence-supplying or burden-of-proof-shifting context.

Plaintiffs, when bringing suit in Wyoming against the state, counties, municipalities or their various subdivisions must invade and destroy the sacrosanct and heretofore impenetrable citadel of governmental immunity or they have no cause of action in tort unless the state has waived the immunity of the governmental entity or unless the court, by decision, will modify, waive or abrogate the defense of immunity.

## ABROGATION OF SOVEREIGN IMMUNITY

### *Do We Dare Disturb the Universe?*[5]

In holding that the governmental subdivisions of the state are subject to suit for damage to individuals injured by the negligent or wrongful acts or omissions by their agents and employees, the North Dakota Supreme Court, in *Kitto v. Minot Park District*, N.D., 224 N.W.2d 795 (1974) cited a "veritable host of courts which have abolished the doctrine."[6] There have been

---

4. It is not urged that there could be no liability for negligent maintenance by reason of the doctrine of sovereign immunity because we have held in *Lore v. Town of Douglas*, Wyo., 355 P.2d 367, that the maintenance of a sewer system is a proprietary function for which there is liability. See also 59 A.L.R.2d, § 3, p. 290.

5. "And indeed there will be time
To wonder, 'Do I dare?' and, 'Do I dare?'
Time to turn back and descend the stair,
With a bald spot in the middle of my hair—
(They will say: 'How his hair is growing thin!')
My morning coat, my collar mounting firmly to the chin,
My necktie rich and modest, but asserted by a simple pin—
(They will say 'But how his arms and legs are thin!')
Do I dare
Disturb the Universe?"
 [From The Love Song of J. Alfred Prufrock—T. S. Eliot]

6. *"City of Fairbanks v. Schaible*, 375 P.2d 201 (Alaska 1962) [interpreting statute]; *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963); *Parish v. Pitts*, 244 Ark. 1239, 429 S.W.2d 45 (1968); *Muskopf v. Corning Hospital District*, 55 Cal. 2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); *Evans v. Board of County Commissioners*, 174 Colo. 97, 482 P.2d 968 (1971); *Spencer v. General Hospital of District of Columbia*, 138 U.S.App.D.C. 48, 425 F.2d 479 (1969); *Hargrove v. Town of Cocoa Beach*, 96 So.2d 130 (Fla.1957); *Smith v. State*, 93 Idaho 795, 473 P.2d 937 (1970) [proprietary and governmental distinction retained]; *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 163 N.E.2d 89 (1959); *Campbell v. State*, 259 Ind. 55, 284 N.E.2d 733 (1972) [state] (citing with approval *Klepinger v. Board of Commissioners*, 143 Ind.App. 155, 239 N.E.2d 160 (1968) [counties] and *Brinkman v. City of Indianapolis*, 141 Ind.App. 662, 231 N.E.2d 169 (1967) [municipalities]; *Carroll v. Kittle*, 203 Kan. 841, 457 P.2d 21 (1969) [proprietary and

others since and I will use many of these opinions in support of my position here.

I am ready to come to grips with this problem of governmental immunity—no holds barred. I am ready (as Mr. Justice Parker, in his dissenting opinion in *Collins v. Memorial Hospital of Sheridan County*, Wyo., 521 P.2d 1339, would have had us do) to

" . . . clean the 'Aegean stable' . . . forthrightly and not by innuendo."

The "stables" would then be spotless—antiseptic, in fact.

The sovereign or governmental immunity principle holds that the state, its subdivisions and municipal entities may not be held liable for a tortious act perpetrated while engaged in a governmental function.[7] The historical origin of the rule is popularly said to be in the English case, *Russell v. The Men of Devon*, 2 Term.Rep. 667, 100 Eng.Rep. 359 (KB 1788). However, there is some question as to just how and where the doctrine originated—a matter which takes on some importance in this opinion. Justice Harnsberger, in *Maffei v. Incorporated Town of Kemmerer*, 80 Wyo. 33, 338 P.2d 808 (April 1959), wrote that this court is committed to the concept of immunity through legislative fiat by reason of

the doctrine's fusion with the common law of England in the 1500's and our legislature's enactment of § 8–17, W.S.1957, adopting the common law prior to the fourth year of James I (1607) as the decision law of Wyoming. *Maffei*, the statute and applicable constitutional provisions will be analyzed because, in repudiating sovereign immunity for Wyoming—which I would do—I would overrule the holdings in the *Maffei* case and all other opinions in conflict with what I say here.

In rejecting sovereign immunity, I would hold, as we did in *Collins v. Memorial Hospital*, supra,[8] that the doctrine is court-created and thus may be court-abrogated; I would reject and deny the doctrine of immunity for the state, county and municipal governments, as well as every division, subdivison and agency of the state, counties or municipalities. In other words, if mine were the majority opinion on this issue, sovereign immunity, by this decision, would be abrogated in Wyoming.

### *"The King Can Do No Wrong"*

### *The Repudiation of an Archaic Anomaly*

In the article, "Governmental Immunity from Damage Actions in Wyoming," by David Minge, Assistant Professor of Law,

---

governmental distinction retained]; *Haney v. City of Lexington*, 386 S.W.2d 738 (Ky. 1964) [municipal corporations]; *Board of Commissioners of Port of New Orleans v. Splendour Shipping & Enterprises*, 273 So.2d 19 (La.1973) [governmental boards and agencies]; *Williams v. City of Detroit*, 364 Mich. 231, 111 N.W.2d 1 (1961); *Spanel v. Mounds View School District No. 621*, 264 Minn. 279, 118 N.W.2d 795 (1962) [school districts, municipal corporations, and other political subdivisions]; *Johnson v. Municipal University of Omaha*, 184 Neb. 512, 169 N.W.2d 286 (1969) [cities, counties, other governmental subdivisions and local public entities—for conditions on premises]; *Brown v. City of Omaha*, 183 Neb. 430, 160 N.W.2d 805 (1968) [governmental subdivisions—motor vehicles]; *Rice v. Clark County*, 79 Nev. 253, 382 P.2d 605 (1963) [counties—negligent operation of roads]; *Willis v. Department of Conservation and Econ. Dev.*, 55 N.J. 534, 264 A.2d 34 (1970) [state];

*Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973) [local governmental units, municipal corporations and quasi corporations]; *Becker v. Beaudoin*, 106 R.I. 562, 261 A.2d 896 (1970) [municipal and quasi municipal corporations]; *Holytz v. City of Milwaukee*, 17 Wis.2d 26, 115 N.W.2d 618 (1962)."

7. In *Savage v. Town of Lander*, 77 Wyo. 157, 309 P.2d 152, 153, we said:
 " . . . The rule is generally recognized that in the absence of statutory provision there can be no recovery against a municipal corporation for injuries occasioned by its negligence or nonfeasance in the exercise of a function which is essentially governmental in character . . ."

8. In *Collins*, Justice Guthrie, speaking for the court, said:
 " . . . This is a court created rule and can lay no claim to any basis of ancient origins."

University of Wyoming,[9] the author observes:

" . . . '[T]he King can do no wrong,' was an early expression of the doctrine . . ."

and

" . . . It is one of the anomalies of legal history that in England the growth of parliamentary democracy was accomplished by the retention of a rule that placed the losses caused by the wrongful acts of the crown upon the innocent victim . . ."

The Wisconsin Supreme Court says, in *Holytz v. City of Milwaukee,* 17 Wis.2d 26, 115 N.W.2d 618, 620 (1962):

"The rule of sovereign immunity developed in this country from an English doctrine and has been applied in the United States far beyond its original conception. The doctrine expanded to the point where the historical sovereignty of kings was relied upon to support a protective prerogative for municipalities. This, according to Professor Borchard, 'is one of the mysteries of legal evolution.' Borchard, Government Liability in Tort, 34 Yale L.J. 1, 4 (1924). It would seem somewhat anomalous that American courts should have adopted the sovereign immunity theory in the first place since it was based upon the divine right of kings."

If there was ever a time when the doctrine had a place in the judicial processes of this country or this state (which I doubt), it has long since passed. Justice Montoya, writing ably for the New Mexico Supreme Court's rejection of governmental immunity in *Hicks v. State of New Mexico,* N.M., 544 P.2d 1153 (1975), attaches a score card as an appendix which shows that 21 states have abolished immunity—9 have partially abolished it—8 states have abolished or waived the concept where insurance is carried—while only 13 states (including Wyoming) continue to fully retain the doctrine.[10]

In Hicks, supra, Justice Montoya alludes to what the Supreme Court of Pennsylvania said in *Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877, 881–882 (1973):

"Governmental immunity can no longer be justified on 'an amorphous mass of cumbrous language about sovereignty . . .' Le Fiar and Kantrowitz, Tort Liability of the States, 29 N.Y.U.L.Rev. 1363, 1364 (1954). As one court has stated:

" ' " . . . it is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, 'the King can do no wrong,' should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs." *Barker v. City of Santa Fe,* 47 N.M. 85, 136 P.2d 480, 482. Likewise, we agree with the Supreme Court of Florida that in preserving the sovereign immunity theory, courts have overlooked the fact that the Revolutionary War

---

9. Published by University of Wyoming College of Law, Land and Water Law Review, in two sections, the first section in Vol. VII, Number 1, 1972, page 229; the second section in Vol. VII, Number 2, 1972, page 617.

10. It should be noted that since the research was undertaken in *Hicks v. State,* supra, we have decided, in *Collins v. Memorial Hospital,* supra, that the purchase of liability insurance constitutes a waiver of immunity up to the amount of the coverage; additionally the legislature has enacted § 1–1018.1, W.S.1957, 1975 Cum.Supp., which waives immunity for all governmental entities carrying liability insurance to the extent of the limits of any such insurance.

was fought to abolish that "divine right of Kings" on which the theory is based." ' "

In *Spanel v. Mounds View School District No. 631*, 264 Minn. 279, 118 N.W.2d 795, 799 (1962), where the doctrine had been invoked with the result that the courts of Minnesota were constrained to deny the petitions of a blind man, a lame man, and a woman who was "halt," the court, speaking through its conscience, said:

". . . We have been troubled for three generations by the unheeded petitions of the lame Frederick Bank, the halt Jennie Snider, and the blind Frank Mokovich. Since we have repeatedly proclaimed that this defense [immunity] is based on neither justice nor reason, the time is now at hand when corrective measures should be taken . . ."

[Bracketed matter supplied]

The author of the opinion in *Spanel*, supra, observed that the Florida Supreme Court, in *Hargrove v. Town of Cocoa Beach*, Fla., 96 So.2d 130, 132, 60 A.L.R.2d 1193, 1195; Annotation, 60 A.L.R.2d 1198, ". . . abolished tort immunity as to the governmental functions of municipalities on the ground that the Revolutionary War abrogated the doctrine that 'the king can do no wrong.' "

California abolished tort immunity in *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 92, 359 P.2d 457, 460; 49 Calif.L.Rev. 400, when Mr. Justice Traynor said of the doctrine that it is

"an anachronism, without rational basis, and has existed only by the force of inertia . . ."

It was said in *Evans v. Board of County Commissioners of County of El Paso*, 174 Colo. 97, 482 P.2d 968, 969:

". . . The monarchical philosophies invented to solve the marital problems of Henry VIII are not sufficient justification for the denial of the right of recovery against the government in today's society. Assuming that there was sovereign immunity of the Kings of England, our forebears won the Revolutionary War to rid themselves of such sovereign prerogatives. [Footnote omitted]"

We could go on ad infinitum citing court decisions which articulate the philosophy of the doctrine's repudiation in America. The above excerpts are typical.

## STARE DECISIS

### Time to Change?[11]

In his writing against the age-old acceptance of the traditional mistakes of the law which he found moribund by the chains of legal doctrinaire, Justice Benjamin N. Cardozo said in "Law and Literature," published in 1931:

"The time is ripe for betterment. 'Le Droit a ses epoques,' says Pascal in words which Professor Hazeltine has recently recalled to us. The law has 'its epochs of ebb and flow.' One of the flood seasons is upon us. Men are insisting, as perhaps never before, that law shall be made true to its ideal of justice. Let us gather up the driftwood, and leave the waters pure."

It was Cardozo's fear that the courts had become so precedent-bound by stare decisis and the rules of the common law which no longer serve us, that the profession could not escape without help from the outside. He was advocating the establishment of a "Ministry of Justice" in the Executive Branch of the Government, the purpose of which would be to save lawyers and courts from themselves.

11.
"There will be time to murder and create,
And time for all the works and days of hands
That lift and drop a question on your plate;
Time for you and time for me,

And time yet for a hundred indecisions,
And for a hundred visions and revisions,
Before the taking of a toast and tea."
 [From The Love Song of J. Alfred Prufrock—T. S. Eliot]

Perhaps in 1931 Justice Cardozo could not envision the possibility of the courts finding their way out of their dilemma—but progress is being made—and we are making it here.

Justice Raper of this court, in *Tavares v. Horstman*, Wyo., 542 P.2d 1275, 1278, when repudiating the doctrine of caveat emptor as applied to the sale of real property and, alternatively, adopting the philosophy of implied warranty, turned to the writings of Justice Cardozo who said:

"' * * * If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors.' " [12]

Judge Johnson, writing for the Supreme Court of North Dakota in *Kitto v. Minot Park District*, N.D., 224 N.W.2d 795, 802 (1974), where that court was engaged in the repudiation of the concept of sovereign immunity from tort action, said of stare decisis:

"Interrelated with this question of legislative and judicial function is the role of stare decisis—reliance upon precedent. This is a rule of life, as well as the law. Even the smallest child expects that what has been granted in the case of his older brother will also be granted to him. However, the rule is not inflexible or we should still be literally following decisions of the courts of William the Conqueror. The common law requires the personal evaluation and experience of individual judges. As Chief Justice Erickstad has observed, 'If it were the sole purpose of this court to decide today's controversies in light of its earlier decisions, much of our work could be taken over, after proper programming, by a computer, . . .'"

Justice Wheeler, in *Dwy v. Connecticut Co.*, 89 Conn. 74, 99, 92 A. 883, 891, de-scribed the atmosphere in which stare decisis should be contemplated when he said:

"That court best serves the law which recognizes that the rules of law which grew up in a remote generation may in the fullness of experience be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the Legislature."

It was said in *Long v. City of Weirton*, W.Va., 214 S.E.2d 832, 859 (1975):

"For the foregoing reasons, we believe the rule of municipal government immunity from tort liability previously applied in this jurisdiction to be unsound and unworkable . . . As respects the doctrine of *stare decisis,* the writer calls upon the words and recitations of Justice Caplan in the decision of *Adkins v. St. Francis Hospital*, 149 W.Va. 705, 143 S.E.2d 154 (1965). In the process of overruling the doctrine of charitable immunity, the Court said:

" 'We think that it is sufficient to say that a rule or principle of law should not be adhered to if the only reason therefor is that it has been sanctified by age. As expressed in *Lovings v. Norfolk & W. Ry. Co.*, 47 W.Va. 582, 35 S.E. 962, "It has been well said that 'it is better to be right than to be consistent with the errors of a hundred years'." ' "

In addressing himself to the role of stare decisis in the sovereign immunity context,

now Chief Justice Guthrie said in *Collins v. Memorial Hospital,* supra:

". . . The writer freely concedes the importance, necessity, and strength of the doctrine of stare decisis and following precedents in areas which might or do threaten the stability of the law, and which may or might conceivably interfere with vested rights, but is unable to utilize this doctrine as a justification for the continuance of an unfair and improper rule which operates to the detriment of those who may suffer tortious injury from such institutions (as hospitals) and which may be ameliorated at least to the extent of the liability insurance coverage without harm to any person or institution." [Parenthetical matter supplied]

I join the writers and courts quoted and cited here and I adopt the philosophy expressed by them as it relates to the doctrine of stare decisis where sovereign immunity is the issue. I cannot go blindly on embracing an age-old doctrine which not only no longer serves us (if indeed it ever did) but which, in fact, imposes a great disservice upon us when its evils are viewed under the magnifying glass of this different and enlightened age.

The judicial conscience must no longer permit us to tolerate a principle of human behavior which, out of hand, denies the injured, the maimed and the loved ones of the dead a right of action against wrongdoing just because the wrongdoer is a servant of the state or municipality. If the state and its entities are to expose the people and their property to negligent acts, then government must expect to respond to suit.

Governmental entities in Wyoming should no longer receive protection from a doctrine whose only claim to judicial integrity is that it is ancient. A concept should

not be permitted to longer live here just because it is old—it must also be just.

## JUDICIAL ABROGATION OF SOVEREIGN IMMUNITY IN WYOMING

### A. *The Constitutional Question*

I turn my attention to a constitutional overlay which is present in the state sovereign immunity area.

The Wyoming Constitution, Article 1, § 8, provides:

". . . Suits may be brought against the state in such manner and in such courts as the legislature may by law direct."

The question posed is whether Article 1, § 8, presents such an impasse as would prevent our abrogating the common-law doctrine of state sovereign immunity. In other words, does this provision grant immunity to the state? I think it does not. For us to hold that the defense of immunity can no longer be raised by the state is in no way offensive to the Constitution which provides that the legislature will specify the manner of bringing the suit and the forum in which it will be brought.

The decisions of this court do not indicate that the genesis of the state's sovereign immunity is lodged in the Constitution. We have held to the contrary when we said in *Collins,* supra, that the rule of immunity is court-created.

While the earliest Wyoming case on the question holds that Article 1, § 8, of the Wyoming Constitution precludes a suit to quiet title of University of Wyoming land as being a suit against the state without its consent,[13] we have subsequently recognized that the state can be sued without the authority of the legislature where the act complained of was undertaken while in pursuit of a proprietary function.[14]

---

13. *Hjorth Royalty Company v. Trustees of University,* 30 Wyo. 309, 222 P. 9.

14. See Minge, supra, Vol. VII, No. 1, page 254, where he says:
"Although the governmental-proprietary distinction has been used in most states only

in connection with municipal liability, in Wyoming several cases involving the state and counties have indicated that those units of government may be liable for wrongs committed during the performance of proprietary functions."

We said in *National Surety Co. v. Morris,* 34 Wyo. 134, 152, 241 P. 1063, 1067, that the state loses its sovereign immunity when it

". . . places itself in the same class and on the same footing with private individuals in connection with its property rights . . ."

This rule was held to be applicable where the state had deposited its funds in an interest-bearing account at a bank and, by so doing, waived preference in the bank's assets upon liquidation.

In *Harrison v. Wyoming Liquor Commission,* 63 Wyo. 13, 32, 177 P.2d 397, 402, when considering the question of whether the State Liquor .Commission (the alter ego of the state) could be made liable to suit without consent of the state, we said:

"The ultimate test of liability or non-liability to suit in this case must then be found in the answer to the question whether the Wyoming Liquor Commission was or was not an agency engaged in a governmental function . . ."

In *Ellis v. Wyoming Game and Fish Commission,* 74 Wyo. 226, 286 P.2d 597, we held that an action against an agency of the state engaged in a governmental function does not lie without the consent of the state.

It would, then, seem incongruous indeed to say that the Constitution prohibits all suits against the state except those to which the legislature has consented, while at the same time recognizing that in some instances suit may be brought without legislative authority if the complained-of undertaking is being carried on while the state is engaged in a proprietary function. It must be assumed that the Constitution either grants immunity or it does not. I think it does not and that the birthplace of the doctrine is in the common law. (*Collins,* supra)

It is my judgment and opinion that Article 1, § 8, is intended to and does furnish specific recognition that suit may be brought against the State of Wyoming, provided only that the State Legislature must establish the conditions and the forum under and in which the litigation may be undertaken.[15]

For this court to hold that the Constitution does not endow the state with immunity squares with our previous holding in *Collins,* supra, that the doctrine is court-created. If the Constitution granted immunity to the state neither this court nor the legislature could take jurisdiction of matters coming within the perimeter of the problem without an amendment.

Consistent with these thoughts and, I presume, in an effort to cause the statutes to comport with our holding in *Collins v. Memorial Hospital,*[16] the legislature in 1975 provided that the defense of governmental immunity will be waived to the

For the cases referred to by Professor Minge, see the following: *Harrison v. Wyoming Liquor Commission,* 63 Wyo. 13, 177 P.2d 397; *Chavez v. City of Laramie,* Wyo., 389 P.2d 23; *Osborn v. Lawson,* Wyo., 374 P.2d 201; *Ellis v. Wyoming Game and Fish Commission,* 74 Wyo. 226, 286 P.2d 597; and *National Surety Co. v. Morris,* 34 Wyo. 134, 241 P. 1063.

15. Pursuant to the authority contained in Article 1, § 8, the legislature has enacted the following statute:

"§ 1–1018. Actions against state agencies deemed actions against state; jurisdiction. —Any action permitted by law, which shall be brought against Wyoming farm loan board, board of land commissioners, state board of charities and reform, public service commission of Wyoming, state board of equalization of Wyoming, or the trustees of the University of Wyoming is hereby declared to be an action against the State of Wyoming and hereafter no action shall be brought against any of such boards, commissions or trustees except in the courts of the State of Wyoming and no action shall be maintained against any of such boards, commissions or trustees in any other jurisdiction. (Laws 1933, Sp.Sess., ch. 35, § 1; C.S.1945, § 3–7601.)"

16. In *Collins v. Memorial Hospital,* supra, we held that the purchase of liability insurance constitutes a waiver of municipal sovereign immunity at least up to the amount of the coverage, even though there was an absence of specific legislative authority for such waiver.

extent of the limits of liability insurance carried by the government entity.[17]

This statute surely says that the legislature recognizes that the basis of the doctrine is not founded in the Constitution because if it were the legislature would be without power to pass § 1–1018.1, Laws 1975, ch. 197, § 1. (W.S.1957, 1975 Cum. Supp.)

### B. *The Statutory Question*

*The Town of Kemmerer v. The Men of Devon*

In *Maffei v. Incorporated Town of Kemmerer*, supra, Justice Harnsberger cited from what we said in *Savage v. Town of Lander*, 77 Wyo., 157, 164–165, 309 P.2d 152, 153–154, where we held:

> " '. . . The rule is generally recognized that in the absence of statutory provision there can be no recovery against a municipal corporation for injuries occasioned by its negligence or nonfeasance in the exercise of a function which is essentially governmental in character. * * *.' "

This had long been the accepted rule in Wyoming. In *Maffei* it was reaffirmed in the face of appellant's challenge to the court to

> ". . . renounce this generally recognized doctrine of municipal immunity and to judicially declare that what is said to be a modern and better public policy is the law of this State."

Justice Harnsberger, writing for the court, said:

". . . This we may not do."—at the same time recognizing the unfairness of the doctrine when he said:

> "We can agree that a rule of law which is merely the product of judicial decision, born of the necessities of particular circumstance, is subject to judicial repudiation when the reasons which gave rise to its judicial adoption have failed or no longer exist . . . "[18]

Before we in this court can accomplish the rejection of the doctrine of sovereign immunity we must contemplate our holding in *Maffei*, as reinforced by *Davis v. Board of County Comm'rs*, supra.[19] We must determine whether we are possessed of the jurisdiction to abrogate the doctrine. In *Maffei* this court held that it does not possess the power (it is without jurisdiction) to repudiate the doctrine of sovereign immunity since only the legislature had the authority to so act under the present state of the law and the statutes.

The paraphrased reasoning and effect of the *Maffei* opinion is as follows:

> The old English case of *Russell v. The Men of Devon* (decided 1788) was not the "judicial parent of the doctrine" (*Holytz v. City of Milwaukee*, supra), but, rather, the concept had long before this (in the 1500's) become a part of the common law. The effect of arriving at such a conclusion was to place the decision-making on the question of sovereign immunity outside the jurisdiction of this

17. "§ 1–1018.1. Governmental immunity waived to extent of liability insurance covered.—The defense of governmental immunity shall be waived to the extent of the limits of liability insurance carried by the governmental entity. This section shall apply to any governmental body or agency in the state securing liability insurance coverage. (Laws 1975, ch. 197, § 1.)"

18. For other cases where we indicated the unfairness while upholding the doctrine, see: *Davis v. Board of County Comm'rs*, Wyo., 495 P.2d 21 (1972); *Denver Buick, Inc. v. Pearson*, Wyo., 465 P.2d 512 (1970); *Bon-*

*durant v. Board of Trustees*, Wyo., 354 P.2d 219 (1960); *Wilson v. City of Laramie*, 65 Wyo. 234, 199 P.2d 119 (1948); cf. *Ramirez v. City of Cheyenne*, 34 Wyo. 67, 241 P. 710 (1925).

19. We said in *Davis v. Board of County Commissioners*:
"... In that connection it may be well to mention that the doctrine in Wyoming *is not* court created. It was adopted by statute (§ 8–17, W.S.1957) as we explained with particularity in *Maffei v. Incorporated Town of Kemmerer*, 80 Wyo. 33, 338 P.2d 808, 80 Wyo. 61, 340 P.2d 759; ... "

court and vest it in the legislature. This is so because, as we said in *Maffei*:

> "Section 16–301, W.C.S.1945 [now 8–17, W.S.1957][20] says the Common Law of England prior to the fourth year of James I (1607) 'shall be the rule of decision in this state.' Thus by statute the doctrine of municipal immunity became the rule of decision in our State and it is only by statute that the doctrine should be abrogated." [Bracketed matter supplied]

Therefore—if the common law provided for immunity *before* the fourth year of James I (1607), Wyoming has, by legislative enactment, adopted the rule of immunity as a part of the common law and this court (it is argued in *Maffei*) is powerless to act. If, however, the doctrine was born *after* 1607 (for example, in *Russell v. The Men of Devon* (1788)), then we are not so inhibited.

I here reaffirm the *Collins* holding that sovereign immunity is a "court-created rule" and in so doing would repudiate and overrule any finding or conclusion reached in *Maffei, Davis*, and any and all other opinions of this court which would have the effect of preventing us from exercising this court's decision-making powers in the realm of governmental immunity. In doing this, I submit these reasons which now support a conclusion opposite that reached in *Maffei* and *Davis*.

Justice Harnsberger, in *Maffei*, discovered a reference in *The Men of Devon* case to Brooke's Abridgement, published before 1558, which indicated to him that the doctrine of sovereign immunity had been a part of the body of the common law since that time. All other scholars and writers that I have studied (except the opinion in one case, infra,) subscribe to the theory and belief that the doctrine had its genesis in *Russell v. The Men of Devon* (1788), supra.[21] In the sixteen years since the publication of *Maffei*, I have found only once court which subscribes to or adopts our theory that the birth of the doctrine occurred before *The Men of Devon*.[22] I would be constrained, therefore, to repudiate the theory that the origin of immunity is in the cases reviewed in Brooke's Abridgement and accede to the school of legal thought which dates the doctrine as 1788, the year *The Men of Devon* was decided. To accept this concept would have the following effect: Since the statute adopts the common law extant prior to 1607 as the rule of decision in Wyoming, this court is, therefore, in no way impeded by statute or legislative prohibition in its contemplation of a common-law doctrine which had its birthdate the year 1788.

Since, therefore, the rule is court-made, and not legislatively-adopted, this court has exclusive jurisdiction over it.

20. Section 8–17, W.S.1957, entitled *Adoption of common law*, reads as follows:

> "The common law of England as modified by judicial decisions, so far as the same is of a general nature and not inapplicable, and all declaratory or remedial acts or statutes made in aid of, or to supply the defects of the common law prior to the fourth year of James the First (excepting the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth and ninth chapter of thirty-seventh Henry Eighth) and which are of a general nature and not local to England, shall be the rule of decision in this state when not inconsistent with the laws thereof, and shall be considered as of full force, until repealed by legislative authority."

21. For example, see the following statement from Holytz, supra, at 115 N.W.2d 620:

> ". . . In *Maffei v. Incorporated Town of Kemmerer* (1959), 80 Wyo. 33, 338 P.2d 808, 810, 340 P.2d 759, the argument was advanced that the *Men of Devon* case in turn relied upon an earlier authority from Brookes Abridgement. However, most historical analyses of the general thesis of municipal immunity agree that the *Men of Devon* case was the judicial parent of the doctrine."

See also *Hargrove v. Town of Cocoa Beach*, Fla., 96 So.2d 130 (1957), 60 A.L.R.2d 1193; *Long v. City of Weirton*, W.Va., 214 S.E.2d 832; 57 Am.Jur.2d, Municipal, School, and State Tort Liability, § 28, p. 39.

22. *O'Dell v. School District of Independence* (Mo.1975, reh. den. 1975), 521 S.W.2d 403—by a four to three decision.

. I would hold the doctrine of sovereign immunity at all levels of state, county and municipal government to be prospectively abrogated from the date of this opinion, provided, however, that no action could be brought under its authority prior to August 1, 1976. I would establish the last-mentioned date for the purpose of permitting the state, through the legislative session of 1976, to accommodate its budget and insurance program to this holding, and likewise, to allow adequate time for counties, municipalities and other governmental subdivisions to make their financial and liability insurance arrangements.[23]

Affirmed.

McCLINTOCK and THOMAS, JJ., not participating.

GUTHRIE, Chief Justice (concurring and dissenting in part).

 I concur in the result hereof based upon the failure of plaintiffs to prove that any actions of the city were the proximate cause of the injury and agree that the doctrine of res ipsa loquitur does not aid plaintiffs. I withhold my agreement, without expression of my views, from that portion of the opinion which discusses sovereign immunity for the reason that I deem it improper and unnecessary of decision to reach this question because of the disposal made upon these first two grounds. As a further ground for this, it is my view that such a far-reaching pronouncement should come from the entire court rather than a panel of the justices. Nor am I satisfied that the immunity doctrine as applied to governmental subdivisions, such as counties, school districts, and municipalities, has the same origin and roots as, or is identical to, that of the sovereign immunity of the State, and would express no view thereon at this time.

RAPER, Justice (concurring in part and dissenting in part).

 I concur in the result. I concur in the reasons for the result set out except for that portion of the opinion of Justice Rose which would abrogate governmental immunity, to which I dissent.

My dissent does not go to it being a decision on an issue unnecessary to a disposition of the case. We cannot freeze ourselves into such a position that when change is essential for judicial progress to fit into the advancement and changing needs of society along with an enlightened jurisprudence, the opportunity should not be avoided but ought to be seized, as long as the issue rests within the framework of the case before the court for consideration.

My dissent does go to the basic concept of governmental immunity and the reasons for its long support in this state and court. I do not believe in any fiction that the sovereign can do no wrong. Our state government is made up solely of agents of all the citizens within the geographical boundaries of Wyoming. The citizens ought to decide the question of whether and, if so, how its government should reimburse one of their fellow citizens for an injury caused by an agent of their government—within the scope of his employment, of course. The agents do the wrong, not the sovereign, and we must accept the human frailties of mistake, imprudent error of judgment and carelessness. Should the State, in its role as principal, be liable for the wrongs of its agents within the usual doctrines of the law of agency with relation to torts? What I am saying is that the legislature of this great state, acting in its capacity representative of the people, should have a first adequate opportunity to establish a plan of compensation to the injured in such a situation.

The legislature gives attention to the aged, the infirm, the sick and the unfortunate, disabled through no fault of any agent of the State. Failure of a legislature to provide for the righting of wrongs caused in the course of governmental oper-

---

23. For such a prospective application of the abolishment of the doctrine of sovereign im-

munity, see *Nieting v. Blondell*, Minn., 235 N.W.2d 597 (1975).

ations has motivated many of the courts of this country in their desire to do justice to abolish the concept of governmental immunity and place government in the same status as the private corporation and citizen in that regard and compelled attention to this other area of human misfortune.

Our legislature has not been entirely unmindful of its protective role and has moved to authorize insurance to cover the injured to the limits of the policy purchased. This court has approved that course in *Collins v. Memorial Hospital of Sheridan County*, Wyo.1974, 521 P.2d 1339, and has abrogated governmental immunity to the extent of policy limits. The legislature took the initiative, as I think it ought to here. Insurance may not be enough. In *Awe v. University of Wyoming*, Wyo.1975, 534 P.2d 97, 106, was a gentle suggestion of the desirability of the legislature adopting a "uniform system of handling state tort liability." It was there further observed that: "Whatever that branch does, consideration must be given to the economics of insurance premiums versus appropriated funds." It may be more feasible to divert insurance premiums into a state-administered tort liability fund. I think we must take judicial notice of the battle raging in other areas; insurance may not be the cure-all to cover liability and may be getting priced out of the business under its heavy exposure.

It is not the duty nor the function of this or any court to tell a legislature how to perform its legislative function. The strength of Justice Rose's opinion, though I disagree that we should allow it, should be a warning that legislative action may be well-advised. It is preferable to start with a sound plan, such as only an example, the Federal Tort Claims Act, than for this court to say, "do it," in the absence of any machinery to place an ordered change into sensible effect. Some supreme courts in judicially abrogating governmental immunity have given prospective effect to their decisions—have set up a deadline but this sort of command should be avoided if at all possible, to prevent upsetting the sensitive balance between the three branches of government—legislative, executive and judicial.

I have another reason for dissenting. I do not believe that within this case we have the whole story. I want to hear the positions, arguments and supporting data of the State, counties, school boards, municipalities, hospital boards and other political subdivisions that would be affected by such an unrelenting sweep as Justice Rose would take. All those concerned should be heard. A case should be before this court in a setting permitting such a coverage, through not only the litigants involved but amicus curiae, representing other interests as well. Until that time, I do not feel equipped to give the question my truly considered attention.

I would not want to be a part of such a shock by a bolt out of the blue. This dissenting opinion must not be construed to be either favoring or opposing abrogation of governmental immunity but is designed only to point up the problem.