R. O. WORTHINGTON and Virginia H. Worthington, as Guardians of the Person and Estate of Kelly J. Worthington, a Minor, Appellants (Plaintiffs below),

v.

The STATE of Wyoming and the State Highway Commission of Wyoming, Appellees (Defendants below),

Edward A. Malar (Defendant below),

and State Farm Mutual Automobile Insurance Company, Appellee (Intervenor below).

Clifford A. SCOTT, Individually and as Father of Mark A. Scott, and Mark A. Scott, Individually, Appellants (Plaintiffs below),

v.

The STATE of Wyoming, the State Highway Commission of Wyoming, and the Motor Vehicle Division of the Department of Revenue and Taxation, Appellees (Defendants below),

Edward A. Malar (Defendant below),

State Farm Mutual Automobile Insurance Company, Appellee (Intervenor below).

Patricia A. MILLER and Harry M. Miller, Appellants (Plaintiffs below),

v.

The STATE of Wyoming and the State Highway Commission of Wyoming, Appellees (Defendants below),

James W. Grandpre, Reiman-Wuerth Co., a Wyoming Corporation, Wyoming Beverage, Inc., a Wyoming Corporation, Oliver Olsen d/b/a Frontier Distributing Co., and the City of Cheyenne, Wyoming (Defendants below).

Nos. 5016–5018.

Supreme Court of Wyoming.

July 18, 1979.

Rehearings Denied Sept. 17, 1979.

John E. Stanfield, of Smith, Stanfield & Scott, Laramie, signed the briefs and appeared in oral argument on behalf of appellants-Worthington in No. 5016.

Forrest S. Blunk, of Gavend, Sullivan & Bryans and Blunk & Johnson, Denver, Colo., signed the briefs and appeared in oral argument on behalf of appellants-Scott in No. 5017.

David H. Carmichael and John C. Patton, of Carmichael & Statkus, Cheyenne, signed the brief on behalf of appellants-Miller in No. 5018; oral argument was presented by Mr. Carmichael.

G. Joseph Cardine, Laramie, and Laird Campbell of DeMoulin, Anderson, Campbell & Laugesen, Denver, Colo., signed the brief on behalf of appellee-intervenor State Farm Mutual Automobile Insurance Company in Nos. 5016 & 5017; oral argument was presented by Mr. Cardine.

John J. Rooney, Atty. Gen., and Glenn A. Williams, Senior Asst. Atty. Gen., Cheyenne, signed the brief on behalf of appellees State of Wyoming, State Highway Commission of Wyoming, and the Motor Vehicle Division of the Department of Revenue and Taxation in Nos. 5016, 5017, & 5018; oral argument was presented by Mr. Williams.

Blair J. Trautwein, Cheyenne, Wyoming Trial Lawyers' Association, signed the brief on behalf of amicus curiae.

Before RAPER, C. J., McCLINTOCK, THOMAS and ROSE, JJ., and GUTHRIE, J., Retired.*

GUTHRIE, Justice, Retired.

This appeal involves three separate suits arising from two different factual situations. These actions were consolidated for the purpose of this appeal for briefing and argument. All three of these appellants vigorously asserted that sovereign immunity, insofar as it applies to the State and particularly to its activities in the area of its construction and general operation through the state highway system should be abrogated. The two factual situations herein involved are hereafter set out.

### Case Number 5018

This action involves an automobile accident that occurred on the 6th day of January, 1977, at or near the intersection of East Lincolnway and Rosebud Street near the eastern edge of Cheyenne outside the city limits. The complaint against the State of Wyoming and the State Highway Department sets out various and assorted alleged negligent actions. It is most detailed but, in summary, appears to be a claim based upon the alleged negligence of the Highway Department for an improper and unsafe design in the area of this accident, for failure to have the proper traffic controls and for failure to have proper signs. The exact nature of the plaintiff's claim is difficult of determination.

This accident involved three vehicles: a large, beverage delivery truck, which was attempting to turn from south on Rosebud to east on Lincolnway, plaintiff's vehicle, which was proceeding west on Lincolnway, and defendant Grandpre's vehicle which was turning from east on Lincolnway to north on Rosebud. The highway, at the time of the accident, was a four-lane road with service roads upon either side. Rosebud extended south of Lincolnway but to

the north terminated as a driveway to a place of business called Mr. Steak. The east and west lanes of the highway are separated by a grass median with a large asphalt area for Rosebud to make its path across Lincolnway. The beverage vehicle pulled out of Mr. Steak going south on Rosebud and stopped in the asphalt portion of the median area between the east and west lanes of Lincolnway and waited for traffic to clear. The beverage truck was on the south side of the median area, which would be the north lane for traffic on Rosebud. When the Grandpre vehicle entered the westbound lane of Lincolnway, his vision to the east was obscured by the beverage truck, which was located in the median. The Grandpre car impacted with plaintiff's motor vehicle immediately upon entrance into the westbound lane of Lincolnway, and plaintiff, Patty Miller, had not, could not, or did not see the Grandpre vehicle turning because her vision was blocked by the beverage truck. The Grandpre pickup hit the driver's side of the Miller vehicle and with resultant injuries to Patricia Miller, which were most severe and caused permanent injury.

The court made disposal of this action by sustaining the motion to dismiss filed by the State, which relied upon the doctrine of sovereign immunity.

### Case Numbers 5016 and 5017

Although there are two separate suits involved under these numbers, they are both based upon one set of facts. Otto and Virginia H. Worthington, as guardians of the estate of their daughter, Kelly J. Worthington, a minor, and Clifford A. Scott, individually and as father of Mark A. Scott, and Mark A. Scott, individually, filed these suits to recover damages for injuries that were suffered as a result of this occurrence. The accident in question occurred approximately 16 miles southwest of Laramie, Wyoming, on August 28, 1976, after a vehicle, which had been driven by Mark

---

* ROONEY, J., having recused himself from participation in this case, GUTHRIE, J., retired, was assigned, having been retained in active judicial service pursuant to § 5, Art. V, Wyo-

ming Constitution, and § 5–1–106(f), W.S.1977, by order of the court entered on January 1, 1979.

Scott, became disabled, forcing him to leave it upon the shoulder of the road with the car pointed in an easterly direction. Another vehicle, which was being driven by Kelly Worthington, was parked upon the same shoulder and facing west so that the light from its headlights would illuminate the Scott vehicle, while he worked upon it. At that time and place, the highway in question had recently been resurfaced by the Wyoming State Highway Department, and there was no center strip or shoulder markings, they having been obliterated in the course of these resurfacing operations. There was no temporary center line and no signs warning of the absence thereof.

On the evening of August 28 at approximately 8:45 p. m., while the Scott and Worthington vehicles were parked as before-mentioned, an eastbound vehicle which was being driven by a defendant Edward Malar ran into the back of the Scott vehicle. Scott, who was standing between his vehicle and the Worthington car, sustained severe leg injuries, which resulted in the loss of both legs. Kelly Worthington was seated in her car, and she sustained a severe neck injury, which led to total paralysis. The Scott vehicle was propelled forward into the Worthington vehicle as a result of the impact with the Malar vehicle. Malar was a man over 67 years of age and had retired as a ranch hand with apparently little financial resource. The claim is made that he had been virtually blind in his right eye for several years, but he had been issued an unrestricted driver's license just seven months prior to the accident. Malar explained that a cloud of dust caused by gravel upon the road obscured his vision, and that this combined with the lack of a center line and shoulder line caused him to run into the Scott car. There is no question but that the center line and the shoulder line had been destroyed as a result of this resurfacing operation and had not been restored.

There is, however, another factor and another factual situation in connection with this claim that is totally different than the Miller case. Plaintiffs, appellants here, further assert in connection with this appeal,

that because at the time of the accident, the State of Wyoming had in full force and effect a liability insurance from State Farm Mutual with a limit of $1,000,000.00 for each occurrence, the State Highway Department had waived sovereign immunity to the extent of this coverage.

This became the subject of consideration by the trial court. After the intervention in this suit by the said State Farm Mutual Insurance Company, they sought declaratory judgment denying coverage and determining their liabilities and rights to the State Highway Department. The court found that this matter did not arise under the coverage of the said insurance policy, and State Farm thereafter moved for summary judgment to implement this finding. This was granted. Appellants have appealed from that judgment as well as the other judgment which held the Highway Department immune under the doctrine of sovereign immunity.

It would appear and no questions are raised in either case that all the appellants had filed proper claims with the State Auditor within the time period within which they should be filed.

Although there has been considerable discussion by this court in the cases of *Oroz v. Board of County Commissioners of Carbon County*, Wyo., 575 P.2d 1155 (1978); and *Jivelekas v. City of Worland*, Wyo., 546 P.2d 419 (1976), this case involves an attack upon long-settled precedent and numerous decisions by this court. Neither *Oroz* nor *Jivelekas, supra*, are authority upon which disposal may be made of this matter.

The principle and basic question herein is whether this court should abrogate the doctrine of sovereign immunity insofar as it applies solely to the State of Wyoming.

In order to make this determination, there are two queries which should be considered and which are:

(1) Is the doctrine of sovereign immunity, as contrasted to so-called governmental or municipal immunity, a part of our statutory body of law as a result of the adoption of § 8-1-101, W.S.

1977, so that any change must be left to legislative action?

(2) Does Art. 1, § 8, Wyoming Constitution, which is as follows,

"All courts shall be open and every person for an injury done to person, reputation or property shall have justice administered without sale, denial or delay. Suits may be brought against the state in such manner and in such courts as the legislature may by law direct."

deny a right of recovery to a claimant for damages absent a clear consent to such suit by the legislature?

We have heretofore held that the doctrine of governmental and municipal immunity, as contrasted to sovereign immunity,

". . . found its genesis in *Russell v. The Men of Devon*, 2 Term.Rep. 667, 100 Eng.Rep. 359 (1788). See *Collins v. Memorial Hospital of Sheridan County, supra; Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 91, 359 P.2d 457, 459; *Hargrove v. Town of Cocoa Beach*, Fla., 96 So.2d 130, 132, 60 A.L.R.2d 1193; *Haney v. City of Lexington*, Ky., 386 S.W.2d 738, 739, 10 A.L.R.2d 1362; *Merrill v. City of Manchester*, 114 N.H. 722, 332 A.2d 378, 380; *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877, 879; *Long v. City of Weirton*, W.Va., 214 S.E.2d 832, 851; *Holytz v. City of Milwaukee*, 17 Wis.2d 26, 115 N.W.2d 618, 620; Prosser, Law of Torts, § 131, p. 978 (4th ed.); cf. *Jivelekas v. City of Worland*, Wyo., 546 P.2d 419, 425. Under this view, municipal immunity cannot be held to be a legislative rule by virtue of § 8–3–101,* W.S.1977, . . ." *Oroz v. Board of County Commissioners of Carbon County, supra*, 575 P.2d at 1157.

This is a court-created rule. *Collins v. Memorial Hospital of Sheridan County*, Wyo., 521 P.2d 1339, 1341 (1974).

This court has distinguished between the doctrines of governmental or municipal immunity and sovereign immunity. *Retail Clerks Local 187 AFL–CIO v. University of Wyoming*, Wyo., 531 P.2d 884, 887 (1975), and see *Oroz* and *Jivelekas, supra*. This view is rather firmly rested upon the fact that the former is almost universally recognized as being rooted in and springing from the case of *Russell v. The Men of Devon, supra*. See *Oroz v. Board of County Commissioners, supra*, and authorities cited. As we have heretofore mentioned, it is just as clearly recognized that sovereign immunity was and is a part and parcel of the common law long prior to the adoption of our federal constitution.[1] *Nevada v. Hall*, 440 U.S. 410, 99 S.Ct. 1182, 1188, 59 L.Ed.2d 416 (1979), notes a statement by Alexander Hamilton in *The Federalist No. 81*, p. 547:

". . . '[it] is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent' . . ." *Nevada v. Hall,* supra, at 419 fn. 16, 99 S.Ct. at 1188, fn. 16.

Additionally, it is readily discernable that governmental subdivisions included in municipal corporations, school districts, city, or any other subdivisions of government, possess none of any of the real attributes of sovereignty being, as they are, creatures of delegated authority which flows from the sovereign state. *Retail Clerks Local 187 AFL–CIO v. University of Wyoming, supra*, 531 P.2d at 887. It is hard to conceptualize the mayor of a city or Wyoming town, or the chairman of the board of county commissioners in a kingly role. The distinction between these doctrines was recognized in *Kitto v. Minot Park District*, N.D., 224 N.W.2d 795, 800–801 (1974), and numerous cited authorities therein. This distinction alone might indicate that pursuant to § 8–1–101, W.S.1977, sovereign immunity of the State is really a matter of statutory law and not court-made law—as are all immunities which were granted to so-called municipal or governmental subdivisions and which

---

* This statute is now denominated § 8–1–101, W.S.1977.

1. Vol. 3, *History of the English Law*, Holdsworth, p. 466 (3rd Ed.), suggests this principle was adopted by the Chancery in 1483.

spring from or owe their origins to the case of *The Men of Devon, supra*. We find this, however, unnecessary of decision, because our disposal in this case and because we rely upon Art. 1, § 8, Wyoming Constitution.

There are few, if any, precedents or rules that have been recognized longer or followed with greater fidelity than the rule that was set out in the case of *Hjorth Royalty Company v. Trustees of University*, 30 Wyo. 309, 222 P. 9 (1924), which held that Art. 1, § 8, Wyoming Constitution, is not self-executing; that no suit can be maintained against the State until the legislature makes provision for such filing; and, that absent such consent, no suit or claim could be made against the State. This was followed in several cases down through and including the case of *Retail Clerks Local 187 AFL–CIO v. University of Wyoming, supra*; and see further the following cases which give recognition to this rule: *Utah Construction Company v. State Highway Commission*, 45 Wyo. 403, 19 P.2d 951 (1933); *Price v. State Highway Commission*, 62 Wyo. 385, 167 P.2d 309, 312 (1946); *Harrison v. Wyoming Liquor Commission*, 63 Wyo. 13, 177 P.2d 397, 402 (1947); *Ellis v. Wyoming Game and Fish Commission*, 74 Wyo. 226, 229, 286 P.2d 597 (1955); and *Hamblin v. Arzy*, Wyo., 472 P.2d 933, 934 (1970). In addition to the fact that this rule is most clearly established by numerous Wyoming authorities, in states having a similar provision to the one in our constitution, it has been almost universally held that such provision, which empowers the legislature to authorize the bringing of suits against the State and providing the procedure therefor, is not self-executing and requires positive, definite legislative action. No suit can be maintained absent such consent set out clearly by statute. 81A C.J.S. *States* § 300, p. 954; 72 Am. Jur.2d, *States*, § 119, p. 509. Thus, if this

court were to accede in this matter to the importunity of these appellants, it would be necessary for us to directly reverse substantial and direct Wyoming authority in violation of the doctrine of *stare decisis* and to further take a view which seems to be very much in the minority in this country.

The rule concerning the consent of the sovereign is of demonstrably ancient origins, as observed in the case of *Nevada v. Hall, supra*, 99 S.Ct. at 1185:

> "The immunity of a truly independent sovereign from suit in its own courts has been enjoyed as a matter of absolute right for centuries. Only the sovereign's own consent could qualify the absolute character of that immunity."

Later in the same opinion appears the following language:

> "The language used by the Court in cases construing these limits, like the language used during the debates on ratification of the Constitution, emphasized the widespread acceptance of the view that a sovereign State is never amenable to suit without its consent. . . ." 99 S.Ct. at 1188.

Insofar as our research has led us, it would appear that this constitutional provision, or one extremely similar to it, is found in North Dakota and Pennsylvania. These provisions most closely track our section.[2] It is noteworthy that both such jurisdictions have since 1974 considered the effect of these markedly similar constitutional provisions with different expressed views of the effect of such provisions; these are the cases of *Kitto v. Minot Park District, supra*; and *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978). *Kitto* held that the provision did not prevent that court from abrogating the so-called governmental immunity, but because there was a distinction between governmental and sovereign immunity, the

---

2. *Kitto v. Minot Park District, supra*, footnote 10, p. 800:

   " 'Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.' Article I, Section 11, Pennsylvania Constitution, P.S.

   " 'Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct.' Article I, Section 22, North Dakota Constitution."

provision did not mandate governmental or municipal immunity. It did not hold on the question of sovereign immunity. The following summarizes the court's decision:

". . . The matter of sovereign immunity of the state itself, which is untouched by this decision, is one on which we would solicit legislative action. The injustices of state immunity remain for one who is injured by the wrongful act of the state government. . . ." 224 N.W.2d at 803.

Contrasted to this is *Mayle, supra,* which abolishes sovereign immunity in a decision made at the end of July, 1978. This is a well written and impassioned attack upon the concept of sovereign immunity and apparently reflects a history of an ongoing and apparently vigorous campaign, or controversy, within that court as to the propriety of the abolition of this doctrine. This decision represents the view of four members of a seven-man court with most rigorous dissents. While it is unquestionably the rule that the majority opinion establishes the law in that jurisdiction, its strength as persuasive authority in another jurisdiction must be examined in light of the fact that it was far from unanimous and also dictates some examination of the reasons for the dissents. Mr. Justice Pomeroy's dissent, 388 A.2d at page 722, makes an observation which the writer believes applicable to our case as well as in *Mayle,* when he said:

". . . Thus I doubt that the majority's historical speculation is sufficient to change what has long been the accepted construction of the constitutional provision—a construction which has been relied upon by the other branches of Pennsylvania government. But I believe that discussion on this point is in any event irrelevant, for it is well settled that a court should undertake an examination of a constitutional provision's historical setting only if the wording of the provision itself is ambiguous."

The basis of the majority holding in *Mayle* is summarized and capsulized in these words:

". . . Despite recent cases in which a majority of this Court accepted the Commonwealth's interpretation of article I, section 11, as the sole reason for retaining the rule of sovereign immunity, we now believe that this constitutional provision does not forbid judicial abrogation of the doctrine. Rather,

" 'The Constitution is . . . neutral—it neither requires nor prohibits sovereign immunity. It merely provides that the presence or absence of sovereign immunity shall be decided in a non-constitutional manner. . . .'

"The history of the adoption of this section indicates that the Framers of 1790 intended to allow the Legislature, if it desired, to choose cases in which the Commonwealth should be immune, but did not intend to grant constitutional immunity to the Commonwealth." (Footnotes omitted.) 388 A.2d at 716–717.

*Mayle* reveals that in arriving at that decision, great dependence was made upon the proceedings at the Constitutional Convention which were peculiar to that state.

Frankly, your writer has some difficulty in brushing aside the fact that these constitutional sections in both North Dakota and Pennsylvania, as well as Wyoming, delegate this power not to the courts but directly to the legislative assembly. Even if the constitution be assumed not to mandate immunity, the delegation of the power is to no other body than to the legislature; it certainly is not to the courts.

Appellants further place considerable reliance upon the case of *Perkins v. State,* 252 Ind. 549, 251 N.E.2d 30 (1969). The constitutional provision in that state is quite different from ours. Additionally, that finding is based solely upon the theory that the state was engaged in a proprietary function, and the opinion denies any intention to pass upon sovereign immunity as such.

However, we do find this case of assistance in construing our constitutional provision to the extent that the Supreme Court of Indiana observed:

". . . There is no plain, unequivocal statement in the Constitution that the

State of Indiana shall be immune against suits imposing a liability for damages; only an inference might be drawn from the above section. As we read this section it occurs to us that the framers of the Constitution assumed that at common law the State was immune from suit and authorized the legislature to modify such liability to the extent it may see fit, providing that no private acts or special acts were passed for the benefit of some individual. We are dealing here not with a constitutional prohibition, but rather with a principle of common law which has its roots in the ancient common law of England which held 'The King can do no wrong'[3] and hence could not be sued in any court of law. Blackstone's Commentaries on The Law, Gavit's Ed., p. 111." 251 N.E.2d at 32.

This quotation rather clearly frames for this writer the principle that a constitutional provision of the character of ours may not establish absolute sovereign immunity, but, as is much recognized, the existence of the rule is left to the legislature to determine what areas and under what conditions it would consent to suit for damages suffered by an individual and under which a recovery might be had by an individual for the wrongs of the State.

The case of *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457, 460 (1961), is probably most often cited and utilized in support of the proposition that all sovereign immunity should be eliminated and that the courts have the power so to do. That case involves a constitutional provision not unlike ours:

" 'Suits may be brought against the State in such manner and in such courts as shall be directed by law.' " (Article XX, section 6, California Constitution) 11 Cal. Rptr. at 92, 359 P.2d at 460.

The court in that opinion really held that this provision did not in itself establish sovereign immunity but said:

" . . . Consistent, however, with our previous construction of essentially identical statutory language, we hold that article XX, section 6 provides merely for a legislative consent to suit." 11 Cal. Rptr. at 93, 359 P.2d at 461.

This, of course, does not encompass the theory that this clause was self-executing, and the writer sees no real conflict with our rule and the thinking there expressed.

Although this court in company with many of the courts in other jurisdictions has long recognized the unfairness and inequity of this doctrine and have been critical of its application, our legislature unlike those of many jurisdictions, including those cited by appellant, has not been deaf to these criticisms but has implemented the constitutional provisions. This body passed a tort-claim's act with provisions for suit against the State, which was vetoed by the governor after the 1976–77 session. In the session just past, the legislature enacted a bill, being Ch. 157, Laws 1979, which gives recognition to the unfairness and inequities of this doctrine. This bill, which was signed by the governor on March 6, 1979, makes provisions for suit against the State for tortious actions and sets out the perimeters of the liabilities and the procedures under which claims should be filed. This act becomes effective on July 1, 1979. Since in *Oroz, supra*, we did recognize the necessity of legislative action and gave prospective application to that decision, we would be forced in this case, in order to make this accommodation, to give prospective application even if we were to abrogate this doctrine of sovereign immunity.

Adherence to *stare decisis* is of great importance, and we are not inclined to

---

**3.** It appears that in the criticism of the immunity doctrine this philosophy is often repeated as the sole basis of sovereign immunity. It makes a most convenient straw man subject to devastating criticism; but your writer suggests that the real logic and most important basis thereof is explained by Mr. Justice Holmes:

" . . . A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends. . . ." *Kawananakoa v. Polyblank*, 205 U.S. 349, 353, 27 S.Ct. 526, 51 L.Ed. 834 (1907).

change a series of precedents long-established. 20 Am.Jur.2d, *Courts*, § 184, pp. 520–521. Without exercise of judicial restraint in this area, the law would lose its stability and certainty, which is the basis of a well-ordered society and the keystone of a stable and orderly system. This court has heretofore observed that the law, being a developing science, requires that the rule of *stare decisis* not be rigid. *Burns v. Burns*, 67 Wyo. 314, 224 P.2d 178, 183 (1950). That case did contain its own limitations when the following observation with reference to its applicability was made:

". . . Whether to do so or not is not always easily determined. It would not be permissible if to do so would be clear and deliberate legislation, the power of which has been delegated to another department of our government. . . ."

The constitutional provision here considered can hardly be construed as anything but a delegation to the legislature of the power to regulate the entire field and not an invitation to the courts to invade that domain.

One of the principle reasons for disregarding the rule of *stare decisis* and to abrogate an existing rule is to prevent the perpetration of an error or inequity. *State v. Ballance*, 229 N.C. 764, 51 S.E.2d 731, 7 A.L.R.2d 407, 411 (1949); *Pawley v. Pawley*, Fla., 46 So.2d 464, 28 A.L.R.2d 1358, 1369 (1950); *Morgenthaler v. First Atlantic National Bank of Daytona Beach*, Fla., 80 So.2d 446, 54 A.L.R.2d 353 (1955); *Austad v. Austad*, 2 Utah 2d 49, 269 P.2d 284, 48 A.L.R.2d 256 (1954); *Carter-Jones Lumber Co. v. Eblen*, 167 Ohio St. 189, 4 Ohio Ops. 256, 147 N.E.2d 486, 68 A.L.R.2d 285 (1958).

Our refusal to abrogate this rule and to follow instead the rule of *stare decisis* will not and cannot result in the perpetuation of this unjust situation because of the legislative response. If we were to abrogate said doctrine, prospective application would nec-

essarily be given to the holding so that it would certainly be moot as to all those cases that would arise prior to July 1, 1979, the effective date of the statute.

These clearly obviate the necessity of this court's testing its power to remove this immunity and to brush aside the rule of *stare decisis* by setting aside well-established and long-followed rules in this jurisdiction. Also, it allows us to completely honor the concept of a separation of powers because the legislature has settled this problem for the citizens of this state. In the time available for research in this case, only one case involving a similar factual situation came to our attention. But the following comment of Mr. Justice Carmody, in the case of *Clark v. Ruidoso-Hondo Valley Hospital*, 72 N.M. 9, 380 P.2d 168, 170–171 (1963) [4] is both reasonable and logical as well as applicable to this case:

"We see no reason (the legislature having taken the action that it has) for the court to reconsider a rule of law that has been effective for so many years in this jurisdiction. The not-too-satisfactory experience in most of those jurisdictions which have attempted to overrule the immunity doctrine by court decision should make it obvious that legislative action on the subject is the preferred solution."

This truth is particularly emphasized by the case of *Oroz* at page 1158, where this court noted:

". . . The removal of immunity, however, does not mean that a governmental entity is liable for all harm that results from its activities. . . ."

Immunity should not be completely abolished. Governmental units should not be liable for all damages or for all their activities. Mr. Prosser, in his *Handbook of the Law of Torts*, sets it out quite well. Courts should not abrogate old and established doctrines of this character if it would be better done by the legislature. Prosser observed:

4. This case was directly overruled insofar as it held that the legislature and not the judiciary was the proper forum for the disposal of the question of sovereign immunity by *Hicks v. State*, 88 N.M. 588, 544 P.2d 1153, 1155. This

does not, in the writer's view, diminish the reasonableness or applicability of these words to this factual situation insofar as it applies to the citation here.

"At the outset it was more or less obvious that some vestige of the governmental immunity must be retained. It was, for example, unthinkable that either [a] state . . . [or] a municipality should be held liable for a wrong decision of its courts, for an erroneous evaluation of property by a tax assessor. In several of the decisions abrogating the immunities, there was language used which reserved the possibility that there might still be immunity as to 'legislative' or 'judicial' functions, or as to acts or omissions of government employees which were 'discretionary.' . . . ." (Bracketed matter supplied.) Prosser, *Law of Torts* § 131, at p. 986 (4th Ed. 1971).

Mr. Justice Raper in *Awe v. University of Wyoming*, Wyo., 534 P.2d 97, 106–107 (1975), made the following observation, which we consider most pertinent:

> "Until such time as the state legislature adopts some uniform system of handling state tort liability, either by sovereign immunity abrogation or limited coverage by insurance, the court is unwilling to now contribute to a hodge-podge of rules with a hodge-podge of exceptions. Whatever that branch does, consideration must be given to the economics of insurance premiums versus appropriated funds."

These clearly indicate that this matter can be far better handled by a legislature to carve out and classify those areas in which the doctrine of immunity shall be abolished and those areas in which it should be retained. If this is not left in the hands of the legislature, this court would be forced to settle the possible areas in which the doctrine should not apply on a case-by-case basis with unnecessary confusion and expense to claimants and to the State. For these reasons, this court must sustain the action of the trial court insofar as it held that the defense of sovereign immunity was available to protect defendants from suit in each of the three cases.

There now remains the issue of whether the automobile liability insurance policy issued by State Farm to the State of Wyoming afforded coverage to the injuries sustained by Worthington and Scott. Although the issue is raised in the context of the summary judgment entered in favor of State Farm on its intervenor's complaint, its resolution is pertinent to the correctness of the trial court's judgment on the State's motion to dismiss, which necessarily found against appellants on their alternate claim that immunity had been waived by the State at least to the extent of the limits of its automobile liability insurance coverage. This claim is predicated upon the application of § 1–35–102, W.S.1977, which provides:

> "The defense of governmental immunity is waived to the extent of the limits of liability insurance carried by the governmental entity. This section applies to *any governmental body or agency* in the state securing liability insurance coverage." [5] (Emphasis supplied.)

The policy issue by State Farm has attached a Blanket Basis Fleet Endorsement, which provides insurance with respect to all motor vehicles owned by and licensed in the name of the State of Wyoming for the coverages specified in the declarations. The declarations limit the purposes for which the coverage is designed to the use of the owned motor vehicle for pleasure and business as defined therein unless within a specified exception. The section that is relevant to this appeal is the liability coverage clause, which states:

> "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> "(A) *bodily injury sustained by other persons,* and
>
> "(B) property damage,
>
> "caused by accident [6] *arising out of* the ownership, maintenance or *use,* including

5. The statute effectively codified the holding of this court in *Collins v. Memorial Hospital of Sheridan County*, Wyo., 521 P.2d 1339 (1974), which applied the rule in a case involving the

purchase of liability insurance by a county hospital.

6. The policy also has attached an endorsement that substitutes the broader word "occurrence"

loading or unloading, of the owned motor vehicle . . ." (Emphasis supplied.)

Appellants, in cases 5016 and 5017, contend that the negligence of the State and the Highway Commission as alleged by their respective complaints involve causes of action that arose out of the use of state-owned motor vehicles, and that the injuries sustained as a result of the accident were within the coverage of this section of the policy. A review of the pertinent allegations in these complaints reveals little with regard to the relationship, if any, between the use of the vehicles in the resurfacing operation and the injuries of Worthington and Scott. Nevertheless, the argument postulated by appellants to this court is that the failure of the State employees to at least temporarily replace the obliterated center line and shoulder markings and to post warnings of their absence was a proximate cause of the accident in question. Insofar as this cause relates to the question of coverage under the insuring clause in question, we find no contention that there was negligence involved in the use of the vehicles in the resurfacing of the road, but it is argued that there is sufficient causal relationship between the use of the vehicles by the State's employees in removing these markings and the injuries in question. In other words, appellants are asserting that when the use of the insured's vehicle gives rise to a condition on the highway which in turn causes the accident, the injury sustained as a result "arises out of" the use of the insured's vehicle.

■■■ The parties to an insurance contract, like any other contract, are free to incorporate therein whatever lawful terms they desire, and the courts are not at liberty to rewrite the policy under the guise of judicial construction. *State Farm Mutual Insurance Company v. Farmers Insurance Group*, Wyo., 569 P.2d 1260, 1262 (1977); *Rosenblum v. Sun Life Assur. Co. of Canada*, 51 Wyo. 195, 65 P.2d 399, 405, 109 A.L.R. 911 (1937); 13 Appleman, *Insurance Law*

*and Practice*, § 7381 (1976 rev.). The primary objective of interpreting an insurance contract is to ascertain what the parties reasonably intended as its object and to ascribe to the terms used their plain, ordinary and customary meaning in order to effectuate the intent of the parties. *McKay v. Equitable Life Assurance Society of U. S.*, Wyo., 421 P.2d 166, 168 (1966); *Ostendorf v. Arrow Insurance Company*, 288 Minn. 491, 182 N.W.2d 190, 192 (1970). When there are any ambiguities or uncertainties in the meaning of the language used in a policy, they must be strictly construed against the insurer who drafted the contract. *Wilson v. Hawkeye Casualty Co.*, 67 Wyo. 141, 215 P.2d 867, 874–875 (1950). However, if the language is clear and unambiguous, there is no room for the court to resort to a strict construction against the insurer, and the insurance policy must be interpreted according to the ordinary and the usual meaning of its terms. *McKay v. Equitable Assurance Society of U. S., supra* at 168; *Addison v. Aetna Life Insurance Company*, Wyo., 358 P.2d 948, 950 (1961); *Coit v. Jefferson Standard Life Ins. Co.*, 28 Cal.2d 1, 168 P.2d 163, 169–170 (1946); *Ostendorf v. Arrow Insurance Company, supra*, 182 N.W.2d at 192.

Courts have an obligation to give a written contract of insurance a practical, reasonable and fair interpretation that is consonant with the apparent object and intent of the parties. *Noyes v. Order of United Commercial Travelers*, 125 Vt. 336, 215 A.2d 495, 497 (1965). The terms of the insuring clause in question are clear and unambiguous. The object of the policy is to provide coverage for any injury or loss caused by an accident "arising out of the ownership, maintenance or use" of State-owned vehicles that are employed for the general purposes of pleasure or business. This provision should not be so strictly construed as to thwart its general object, *Miles v. Continental Casualty Company*, Wyo., 386 P.2d 720, 722 (1963); and it must be emphasized that

for "accident" but requires either an expected event or a continuous or repeated exposure to conditions, which causes an injury or a loss.

The endorsement does not affect our consideration of the issue presented here.

the policy is not a general comprehensive liability contract, which covers every conceivable liability to which the State of Wyoming may be subjected. Thus, our primary duty is not so much concerned with the concept of causation as it is with ascertaining whether the insured vehicles' connection with the activities that gave rise to the injuries were sufficient to bring those general activities, and the negligence connected therewith, within the risks for which the parties to the contract reasonably contemplated there would be covered. *Lawver v. Boling*, 71 Wis.2d 408, 238 N.W.2d 514, 518 (1976). It is this task that restrains a court from liberally and unreasonably construing an insurance contract to permit a strained or unnatural interpretation in order to find coverage for innocent victims who are subjects of enormous sympathy. Otherwise, the effect would be to bind an insurer to a risk that was not contemplated and for which it was not paid. *D'Angelo v. Cornell Paperboard Products Co.*, 59 Wis.2d 46, 207 N.W.2d 846, 848 (1973).

■ While there appears to be no previous decisions in this jurisdiction that have interpreted the words "arising out of the ownership, maintenance or use" in the context of an automobile liability insurance policy, the question has been frequently litigated. The cases are in general agreement that a causal connection or relation must exist between an accident or injury and the ownership, maintenance or use of an insured vehicle before the injury or loss sustained can be considered within the risk covered by the clause. Annot., *Automobile Liability Insurance—Risks*, 89 A.L.R.2d 150, 153 (1963); and 12 *Couch on Insurance 2d*, § 45:56 (Anderson Ed. 1964). The words "arising out of . . . use" are broad, general and comprehensive terms, and are understood to mean originating from, growing out of or flowing from the use of the automobile. *Schmidt v. Utilities Ins. Co.*, 353 Mo. 213, 182 S.W.2d 181, 183–184, 154 A.L.R. 1088 (1944); *Carter v. Bergeron*, 102 N.H. 464, 160 A.2d 348, 353, 89 A.L.R.2d 142 (1960). The language, however, does not require a finding of direct and proximate causation in the strict legal sense or as

would arise in tort cases, but only that the injury or loss arose out of use. *Insurance Company of North America v. Royal Indemnity Company*, 6th Cir., 429 F.2d 1014, 1018 (1970); *National Indemnity Co. v. Ewing*, 235 Md. 145, 200 A.2d 680, 682 (1964); *Carter v. Bergeron, supra*, 160 A.2d at 353.

■ In determining whether an injury arose out of use, the evidence must demonstrate that it was the natural and reasonable incident or consequence of the use of an insured vehicle, the causal connection being reasonably apparent. *Associated Independent Dealers, Inc. v. Mutual Service Insurance Companies*, 304 Minn. 179, 229 N.W.2d 516, 518 (1975); *Fidelity & Casualty Company of New York v. North Carolina Farm Bureau Mutual Insurance Company*, 16 N.C. App. 194, 192 S.E.2d 113, 118 (1972), *certiorari denied*, 282 N.C. 425, 192 S.E.2d 840 (1972); 12 *Couch on Insurance 2d, supra*, § 45:56, at p. 148. If the injury was directly caused by some independent or intervening cause wholly disassociated from, independent of or remote from the use of the automobile, the injury cannot be held to arise out of its use. *Schmidt v. Utilities Ins. Co., supra*, 182 S.W.2d at 184; *Norgaard v. Nodak Mutual Insurance Company*, N.D., 201 N.W.2d 871, 875 (1972); 6B Appleman, § 4316 (Buckley Ed., 1979 rev.). The resolution of the question necessarily depends to a great degree upon the particular facts presented by each individual case. *Associated Independent Dealers, Inc. v. Mutual Service Insurance Companies, supra*; *Schmidt v. Utilities Ins. Co., supra*.

While our research did not reveal any cases presenting circumstances identical to this case, we found two decisions that are analogous. In *Tillman v. Canal Insurance Co.*, La.App., 305 So.2d 602 (1974), *writ refused*, 307 So.2d 630 (La.1975), a wrongful death case, the evidence showed that a few hours before the accident gravel had been spilled from one of the insured's trucks onto the highway for a distance of 500 to 600 feet. The spillage was three feet high at its terminus. The accident occurred when the driver of a tractor-trailer unit struck

the gravel in his lane of traffic causing the unit to cross over to the other lane and to crash head-on into a pickup truck. Both occupants of the pickup were killed. One of the questions raised in that case was whether insurance coverage involving the operation and use of the gravel truck was provided by the comprehensive general liability provision or by the automobile liability feature of the policy. The Louisiana Court of Appeals affirmed the denial of coverage under the automobile liability provision, holding that the intervening act of the driver, apart from the operation and use of the gravel truck, set in motion the harm that was visited upon the plaintiff. The court found that a cause of action for damages existed in the driver's negligence in leaving the spilled gravel on the highway unattended and failing to mark the hazard or warn the motoring public but concluded that there was no connection between the use of the truck from which the gravel was spilled and the failure to protect the motoring public.

*Raube v. Christenson,* 270 Wis. 297, 70 N.W.2d 639 (1955), presented the question of whether a county's automobile liability policy, which afforded coverage for accidents arising out of the use of automobiles, trucks and tractors for the purpose of snow removal, covered an intersectional collision allegedly caused by a motorist's inability to see a stop sign. It was alleged that the county and its highway commissioner were liable because three weeks before the accident its highway maintenance crew negligently covered the stop sign with ice and snow, which created a condition that was a proximate cause of the accident. In rejecting the plaintiff's contention that her injuries arose out of the use of county vehicles, the Supreme Court of Wisconsin said:

". . . We fail to perceive any reasonable connection between the use of any vehicles which projected the ice and snow to the vicinity of the sign and the injuries sustained by the plaintiff. *The use of the vehicles was not reasonably incident to or associated with the collision. It cannot be said that the injuries were the proximate result of the use of the vehicles, or that such use was a substantial factor in causing the injuries.* The plaintiff's injuries may have been caused by virtue of [the defendant's] inability to have seen the stop sign because it was covered with snow and ice. *However, the use of the vehicles which placed the ice and snow over the sign was not the cause of the injuries. The cause may have been in the action of the county's employees in placing the snow and ice over the sign or in not removing it. . .*" (Bracketed matter and emphasis supplied.) *Id.,* 70 N.W.2d at 643.

Both cases illustrate that even though antecedent use of an insured vehicle may create a condition that later results in harm, this fact alone is not necessarily sufficient to bring the harm within the coverage of the insuring clause—especially when the facts reveal intervening acts of negligence clearly disassociated from the use of the automobile. The distinction is significant to this case since, unlike the conditions created in *Tillman* and *Raube, supra,* there was no patently dangerous hazard in the condition created in connection with the use of the vehicles. There was no allegation that the acts connected with the obliteration of the center line and shoulder markings, which are necessary incidents of road repairs, were a proximate cause of the accident. Instead, it was alleged that State employees negligently omitted to protect the motoring public from whatever latent hazards existed as a result of the repair operation—the replacement of the markings, and the taking of adequate measures to warn motorists of the hazard. When viewed in light of the applicable case law, the interpretation asserted by appellants is impractical and unreasonable.

The position asserted is indeed unique because it is based upon the before-mentioned omissions and not upon any definite affirmative actions, but rather the failure on the part of some employees to do certain things. There is certainly no suggestion that these alleged omissions can arise from the use of any motor vehicle. All the citations of appellants have been read and ex-

amined along with a great many other cases and in no case has the writer found any claim for loss sustained under causes so remote or tenuous.

██ We hold that the trial court correctly found that the injuries suffered by Worthington and Scott were not within the risks reasonably contemplated by the insurance contract between State Farm and the State of Wyoming. The evidence here simply fails to disclose that their injuries were the natural and reasonable incident of the use of State-owned vehicles in repairing the highway. As we have previously surmised, there was alleged several acts of negligence, which might fairly be said to have been a proximate or contributing cause of this accident, but which were clearly remote from the use of the vehicles. The scope of coverage afforded by the type of insuring clause in question must end at some point, and this case represents a point well-beyond the line that must reasonably be drawn. *Associated Independent Dealers, Inc. v. Mutual Service Insurance Companies, supra.*

Affirmed.

McCLINTOCK, J., concurred in the result.

ROSE, J., filed a dissenting opinion.

ROSE, Justice, dissenting.

The majority opinion disclaims making any determination as to whether sovereign immunity is part of our statutory law by virtue of § 8–3–101, W.S.1977 [now § 8–1–101, W.S.1977, August 1978 Replacement].[1] It relies entirely on principles of stare decisis and a view that Article 1, Section 8, Wyoming Constitution, requires a legislative consent to suit before the State can be sued for damages. Based on these observations, the opinion concludes that it is up to the legislature—not the court—to determine what areas and conditions are recognized for purposes of a consent to sue.

I cannot agree.

Had I been writing for a majority of the court, I would have returned to *Hjorth Royalty Co. v. Trustees of University*, 30 Wyo. 309, 222 P. 9 (1924), where this court said Article 1, Section 8, is not self-executing and no suit is authorized *until* the legislature makes provision and consents to such a suit, and I would have corrected that erroneous holding. A proper construction would be that Article 1, Section 8,[2] merely authorizes the legislature to *provide* procedures for suit if it so desires. See Minge, Governmental Immunity—Part II, Vol. VII, No. 2, Land and Water Law Review, 617, at 658 (1972).

According to the plain language of Article 1, Section 8, this provision can be parsed as follows:

1. Suit may be brought against the state,
2. *Provided* the legislature may establish procedures and venue for such suits.

There is no room for construction of this provision—it simply says suits can be brought against the State and it plainly gives the legislature (and not some other branch of government) the power to establish procedures and venue. One must do a great deal of implying to conclude that this constitutional provision gives to the legislature the power to determine the kinds of

1. Section 8–3–101, W.S.1977 [now § 8–1–101, W.S.1977, August 1978 Replacement], provides:
 "*Adoption of common law.*
 "The common law of England as modified by judicial decisions, so far as the same is of a general nature and not inapplicable, and all declaratory or remedial acts or statutes made in aid of, or to supply the defects of the common law prior to the fourth year of James the First (excepting the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth and ninth chapter of thirty-seventh Henry Eighth) and which are of a general nature and not local to England, are the rule of decision in this state when not inconsistent with the laws thereof, and are considered as of full force until repealed by legislative authority."

2. The pertinent part of Article 1, Section 8, of the Constitution of Wyoming, is:
 ". . . Suits may be brought against the state in such manner and in such courts as the legislature may by law direct."

cases in which suit may be brought. Such an implication gives rise to the "consent-to-suit" philosophy. For me, such an implication is improper, and I am, therefore, able to distinguish the language found in *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978), from Article 1, Section 8. *Mayle* holds that, since the Pennsylvania Constitution is neutral on both the establishment or prohibition of immunity from liability, it follows that the legislature may choose cases in which the state should be immune. In *Mayle*, the Pennsylvania Supreme Court was concerned with constitutional language which included the words "and in such cases," thus justifying the conclusion reached by the court.[3] The Wyoming Constitution does not say "and in such cases." How, then, can it be said that the legislature has power under Article 1, Section 8, "to determine what areas and under what conditions it would consent to suit," as the majority opinion holds?

I would have held that Article 1, Section 8, does not establish immunity from liability, *nor* does it allow the legislature to establish such immunity indirectly by controlling the State's consent to suit. Rather, the provision expressly *provides for* suits against the State—i. e., it makes such suits *permissible*—and grants the legislature *narrow* powers to establish procedures and venue. Any attempt to go beyond the establishment of procedures and venue is unauthorized and, indeed, violative of Article 1, Section 8.

I would have responded to the only argument that can be validly made in opposition to my position as expressed above as follows: First off, I am cognizant of the concept which says:

". . . The principle is elementary that a State cannot be sued in its own courts without its consent. This is a privilege of sovereignty. . . ." *Railroad Company v. Tennessee*, 101 U.S. 337, 339, 25 L.Ed. 960 (1879).

See, also, *State of Nevada v. Hall*, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979). In *State of Nevada v. Hall*, the United States Supreme Court described the principle as rooted in the structure of the English feudal system and based on the fiction that the King could do no wrong. The fiction was rejected, but the structural basis for the principle was retained by explaining that sovereignty meant "the right to govern," which necessarily encompassed the right to determine what cases may be brought in the sovereign's own courts. The Court also repeated the words of Justice Holmes (set out in the majority opinion, footnote 3), that immunity from suit rests on the logical ground "that there can be no legal right as against the authority that makes the law on which the right depends."

My response to this argument is that it is *correct only if* we deny the power of the court to abrogate the doctrine of immunity from liability *and if* we deny the reasonable construction of Article 1, Section 8, as constituting an *affirmative* grant to the people of the right to sue the state and a limitation on the legislature's ability to modify such a right. To say that immunity from suit is an inherent part of a state's sovereignty is not to say that the people, in formulating their state's constitution, could not have modified that principle. The only question is whether they did so, or if there is presently a reasonable basis for holding that this is what they did.

We have no way of precisely ascertaining the framers' actual intent—the debate of the constitutional convention being silent on the matter—but we can assume they were aware that the sovereign was immune at common law, absent consent to suit. In support of this assumption, it is said in 23 American and English Encyclopedia of Law 86 (Williams ed. 1893):

"A constitutional provision that suit may be brought against the state in such courts *and in such cases* as the Legislature may by law direct." [Emphasis supplied]

---

3. The pertinent part of article I, section 11, of the Constitution of Pennsylvania is:

". . . Suits may be brought against the Commonwealth in such manner, in such

manner as the legislature thereof may direct, does not compel that body to act; until a statute has been passed agreeably to such provision, the state retains its immunity from suit."

The editor cites several state court decisions, pre-dating the adoption of the Wyoming Constitution, which are represented as supportive of this doctrine. See, *Turner v. The State,* 27 Ark. 337 (1871), *The People v. Talmage,* 6 Cal. 256 (1856); *The State of Nebraska v. Stout,* 7 Neb. 89 (1878), and *The Chicago, Milwaukee & St. Paul Ry. Co. v. The State,* 53 Wis. 509, 10 N.W. 560 (1881). Each of these cases, however, involves the interpretation of a constitution providing for suits against the state in such manner and in such courts as the legislature *shall* direct by law. The Wyoming Constitution says, "as the legislature *may* by law direct." The one case cited by the editor which is directly in point—in that the constitutional provision in question is identical to ours—is *Williams v. The Register of West Tennessee,* 3 Tenn. (Cooke) 161 (1812).

The *Williams* decision indicated the doctrine of separation of powers precluded the court from providing a remedy by way of mandamus for a legitimate claim when the legislature had prohibited the recognition of the claim in question and had not yet acted pursuant to the constitutional provision concerning suits against the state. This was true, according to the court, since

"... On general principles, the idea of an individual citizen, or subject, compelling the sovereign to do an act, is repugnant to every idea of sovereignty. ..." 3 Tenn. (Cooke), at 164–165.

The court did indicate, however, that a person in the position of the claimant could obtain redress in a court of equity.

None of the pre-1890 decisions cited above provide a rationale—except the repugnance-to-sovereignty argument—for interpreting the constitutional provision in question as being without effect until the legislature acts. Stated differently, these early decisions determined that sovereign immunity, absent some legislative actions to the contrary, was the rule, but this rule was based on common-law notions of sovereignty and not on the directives of the constitution. Relying on the analysis tendered by Justice Roberts, in *Mayle v. Pennsylvania Department of Highways,* supra, 388 A.2d at 717–718, it can be said that there is no historical evidence that provisions like Article 1, Section 8, were added to make sovereign immunity the constitutional rule unless the legislature decides otherwise.

It is important to note that no reported Wyoming case attempts to discuss or ascertain the intentions of the framers of the Wyoming Constitution in enacting Article 1, Section 8. The decision in *Hjorth Royalty Co. v. Trustees of University,* supra, assumes the propriety of an interpretation of Article 1, Section 8, to the effect that the state is privileged simply because the legislature had not made provision for suits against the state. In doing so, the court relies on the general rule stated in 36 Cyclopedia of Law & Procedure 913 (1910). Research, previously cited, discloses that such general rules were based on cases which, in turn, were rooted in the common-law notions of sovereignty.

Since there is no evidence that the constitutional framers intended sovereign immunity, absent legislative consent, to be the rule, and realizing that decisions so holding were based not on the constitutional provision itself but on a reading by the courts of common-law notions into the constitutional provisions, there is, in my judgment, a firm basis for concluding that such former interpretations were erroneous. Additionally, since these erroneous interpretations were made by the court—and not by the people of the state—the courts have the power to correct the error.

I suggest correction of this historical mistake by pointing out that an interpretation which holds that Article 1, Section 8, grants the right of the people to sue the state, is more consistent with this nation's hostility to the absolute power of the sovereign that existed at the Revolutionary War period. Having said that, we can then proceed to an interpretation of Article 1, Section 8.

I have previously expressed the ultimate interpretation I would make of Article 1, Section 8, namely that it merely grants to the legislature the narrow authority to prescribe the procedures for and venue of suits against the state. I have reached this conclusion for these several reasons.

The plain language of Article 1, Section 8, does not expressly grant to the legislature the power to determine in what cases suit may be brought against the state (as is true in Pennsylvania and North Dakota).[4]

The legislature of this state possesses all legislative authority except as restricted by the State or Federal Constitutions either expressly or by clear implication. *State v. Snyder*, 29 Wyo. 199, 222–223, 212 P. 771, 779 (1923). This is true, according to Justice Potter, even though he recognized in *Snyder* that:

> " 'A state government is an independent existence, representing the sovereignty of the people. The power of the Legislature is the power of that sovereignty, and, as a general proposition, is supreme in all respects and unlimited in all matters pertaining to legitimate legislation. . . .' " *State v. Snyder*, 29 Wyo. 199, 230, 212 P. 771, 782, citing *City of Richmond v. Pace*, 127 Va. 274, 103 S.E. 647.

As I have noted in my dissent in *Stephenson v. Mitchell*, Wyo., 569 P.2d 95, at 108 (1977), our state constitution is not a grant or delegation of power, but is a limitation or restriction of power. I would, therefore, hold that Article 1, Section 8, clearly implies a restriction on the legislature's power to modify the State's amenability to sue, and that any legislation which goes beyond procedures or venue is illegitimate legislation.

*Summary:*

The impact of the above discussion is far-reaching, but I submit it as a justifiable way to give its true meaning to Article 1, Section 8, and to the judiciary's inherent power to abrogate sovereign immunity

from liability through the correction of previous erroneous decisions. Provisions like Article 1, Section 8, are always thrown up as the last frantic justification for retention of the doctrine. By pointing up the erroneous nature of those decisions which are raised in the name of stare decisis, I would have, in this manner, overcome this barrier and abrogated the doctrine of State sovereign immunity in Wyoming.

---

4. At least one student of the Wyoming Constitutional Convention has opined that Article 1, Section 8, was modeled after the North Dakota provision. Prien, Background of the Wyoming Constitution (1956, University of Wyoming Master's thesis). If this is true, some significance should be given to the intentional deletion of the words "and in such cases."